420 F.2d 709
 Anthony RUGGIERO, Michael Ruggiero, Mary Ruggiero, Ralph Ruggiero and Mary Theresa Ruggiero, a co-partnership, doing business under the fictitious name of Pacific Development and Investment Company, duly registered as a fictitious name in the County of Los Angeles, State of California
v.
The UNITED STATES.
 No. 338-67.
 United States Court of Claims.
 January 23, 1970.
 
 Louis A. Audet, Los Angeles, Cal., attorney of record for plaintiffs.
 Howard O. Sigmond, Washington, D. C., with whom was Asst. Atty. Gen. Shiro Kashiwa, for defendant; James E. Clubb, Washington, D. C., of counsel.
 Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.
 OPINION
 NICHOLS, Judge:*
 
 
 1
 The plaintiffs sue to recover the sum of $11,520.20, representing part of a deposit totaling $25,260 which they made in bidding for the purchase of eight parcels of unimproved Government land situated in San Diego, California.
 
 
 2
 It is our opinion that the plaintiffs are entitled to recover.
 
 
 3
 The plaintiffs are five members of the Ruggiero family, residing in or near Los Angeles, California, and doing business as partners under the name of Pacific Development & Investment Company Michael Ruggiero, apparently the managing partner, is a school teacher. Anthony Ruggiero is a builder. Ralph Ruggiero is an aeronautical engineer. Mary Ruggiero, Michael's spouse, is a housewife. Mary Theresa Ruggiero is also a housewife.
 
 
 4
 Sometime in the early part of 1966, the regional headquarters of the General Services Administration in San Francisco issued an invitation for bids which announced that sealed bids for the purchase of 43 separate parcels of unimproved Government land situated in San Diego would be received until 11:00 a. m., PDT, on April 26, 1966 at a specified GSA office in San Francisco, and that the bids would then be opened at the time and place mentioned. The 43 parcels of land were designated by numbers, and their respective acreages — ranging from 5 acres (plus or minus) to 59 acres (plus or minus) — were given. A map showed the location of the parcels and the topography.
 
 
 5
 The invitation included a bid form, which provided spaces for separate bids on some or all of the 43 individual parcels and also provided a different space for the submission of a bid on any group of parcels (to be designated by the bidder), or he could bid for the entire area. In this connection, the invitation stated in part as follows:
 
 
 6
 * * * A bid deposit [equal to 10 percent of the bid price] must be made on each parcel on which a bidder desires consideration, unless the bid is for a group of parcels. In such case, the bidder must state only the total amount of his lump sum bid for said group and specifically identify the items included in the group. * * *
 
 
 7
 The general terms stated that in the event of revocation of a bid after opening and before acceptance, defendant might at its option forfeit the deposit or, without forfeiture, pursue other remedies.
 
 
 8
 The plaintiffs received a copy of the invitation for bids, and they decided that they would like to acquire several of the parcels of land mentioned in the invitation. With respect to three of the parcels, Nos. B-198, B-199, and B-201, which were contiguous and together contained a total of approximately 56 acres, the plaintiffs believed that these parcels could be effectively developed as a unit by establishing in the area a mobilehome park, a trailer park, and a clubhouse.
 
 
 9
 Acting under the name of Pacific Development & Investment Company, the plaintiffs on April 20, 1966 submitted on the prescribed bid form separate bids for the purchase of eight of the parcels mentioned in the invitation. Cashier checks in an aggregate amount ($25,260) equal to 10 percent of the total sum bid by the plaintiffs for the eight parcels accompanied the bid form.
 
 
 10
 Only three of the parcels on which the plaintiffs submitted bids are involved in the present litigation, and they are Nos. B-198, B-199, and B-201. The plaintiffs submitted a bid of $21,001 for B-198, a bid of $65,101 for B-199, and a bid of $50,101 for B-201. Another person bid $22,184 for B-198. The nearest bids for B-199 and 201 were $25,600 and $36,008 respectively.
 
 
 11
 The plaintiffs did not, on April 20, 1966, submit a bid on any group of parcels, but the plaintiffs subsequently endeavored to establish that their separate bids on B-198, B-199, and B-201 were really intended as a bid for these three parcels as a group.
 
 
 12
 A San Francisco telephone number — 556-6875, Area code 415 — appeared on the invitation for bids. This telephone was located in an office which was shared by Thomas N. Scott and a Mr. Peters, both of whom were GSA employees assigned to the regional headquarters in San Francisco. Thomas N. Scott was a realty officer who had been designated to answer inquiries concerning the sale of the lands mentioned in the invitation for bids.
 
 
 13
 On April 25, 1966, which was the day before the day on which the bids were to be opened, Michael Ruggiero made a long distance telephone call to number 556-6875 in San Francisco and talked to an unidentified person at that number. He stated to the person at the other end of the line, with reference to the prospective opening of bids, that parcels Nos. B-198, B-199, and B-201, being contiguous, were an entity to the plaintiffs, and these three parcels were to be considered as a group. The person replied that the matter would be considered after the bids were opened. He "could guarantee nothing."
 
 
 14
 All bids were opened on April 26, 1966. On May 3, 1966, the plaintiffs were notified that their bid on parcel B-198 was rejected. The 10 percent deposit which the plaintiffs had made in connection with their bid on B-198 was refunded to the plaintiffs.
 
 
 15
 The plaintiffs on May 10, 1966, protested in writing to the contracting officer against the rejection of their bid for parcel B-198. The plaintiffs stated that parcels B-198, B-199, and B-201 "were to be considered as a group * * * because they were contiguous"; and the plaintiffs requested that "our firm be sold Parcel 198 as well as Parcels 199 and 201 which are contiguous and on which we were high bidders by a very wide margin * * *."
 
 
 16
 The contracting officer stated in reply to the plaintiffs' letter of May 10, 1966, that "your bid was submitted for individual parcels only and there is no way we can consider a combination bid on Parcels 198, 199 and 201 * * *."
 
 
 17
 On May 13, 1966, Michael wrote a further letter to the contracting officer, stating (among other things) that "we still wish these three bids to be considered as a group bid," and that "Unless these three parcels are considered as a group * * * bid at the total bid price of $136,203 * * * then we will retract our bid offers on parcels 199 and 201, and demand our bid deposit money be returned." In the same letter, he said:
 
 
 18
 * * * There must have been a clerical mistake on the part of our secretary. Either the carbon copy did not transfer properly or the information from our original bid copy which is in our possession was not copied completely.
 
 
 19
 In any case we still wish these three bids to be considered as a group bid as we intended in our original copy of the bid form. We are enclosing this original copy for your files and for your inspection.
 
 
 20
 The enclosure was the bid form, filled in substantially as in the original submission, in red pencil, but the part of the form that was provided for group bids was now made out as follows:
 
 
 21
 GROUP (Designate Parcel)
 (198,199,201)
 ________________________________
 $136,203
 _________________________________
 
 
 22
 This is, of course, a part that was left blank in the original bid.
 
 
 23
 This failed to have the effect intended. The contracting officer concluded, as he testified, that there was no mistake. As Government counsel points out, Michael Ruggiero, not his secretary, admittedly prepared the original bid, in his own hand, and the duplicates forwarded to defendant on April 20, included this original. If in the retained copy, the lines for group bids were filled in, it is hard to see why Mr. Ruggiero thought it necessary to telephone the contracting officer to clarify the matter on April 25.
 
 
 24
 Subsequently, on May 18, 1966, the plaintiffs' bids in the total amount of $115,202 on parcels B-199 and B-201 were formally accepted by the contracting officer, and an additional remittance was demanded to cover the remainder of the 20 percent down payments required under the terms of the invitation for bids.
 
 
 25
 After further correspondence between the parties, in which the plaintiffs demanded either that parcels B-198, B-199, and B-201 be sold to them as a group or that their 10 percent deposits on B-199 and B-201 be returned to them, and in which the defendant demanded the remainder of the 20 percent down payments allegedly due on B-199 and B-201, the defendant finally, on April 18, 1967, pursuant to the article referred to above, declared that the 10 percent deposits made in connection with the plaintiffs' bids on B-199 and B-201 were forfeited. The total forfeiture amounted to $11,520.20.
 
 
 26
 The first issue in the case is whether the plaintiffs' telephone call of April 25, 1966, or the plaintiffs' letters of May 10 and 13, 1966, were sufficient to convert their separate bids on parcels B-198, B-199, and B-201 into a group bid for these three parcels, or, if not, whether the letter of May 13, 1966, was sufficient to withdraw the plaintiffs' bids on parcels B-199 and B-201.
 
 
 27
 In the first place, it is clear that the plaintiffs' telephone call of April 25, 1966, — i. e., on the day before the opening of the bids — did not constitute a valid bid for parcels B-198, B-199, and B-201 as a group, or effect a modification of the plaintiffs' pending separate bids for these three parcels into a bid for the three parcels as a group. The invitation for bids stated expressly that "Bids must be submitted in duplicate on the Bid Form accompanying this Invitation for Bids" (emphasis supplied), and that "Bids submitted in any other manner * * * may be summarily rejected." It further stated that telegraphic bids would not be considered, although bids might "be modified or withdrawn by telegram prior to the time fixed in this Invitation for Bids for the opening of bids." These provisions made it clear that a valid bid could not be submitted orally, and that a valid written bid could not be modified orally.
 
 
 28
 The plaintiffs' letters of May 10 and 13 were received after the bids were opened on April 26, 1966. In this connection, the invitation for bids provided in part that "modifications or withdrawals * * * received * * * after the exact time set for opening of bids will not be considered unless: (1) they are received before award is made; and either (2) * * * it is determined by the Government that the late receipt was due solely to delay in the mails * * * for which the bidder was not responsible; or (3) * * * it is determined by the Government that the late receipt was due solely to mishandling by the Government after receipt at the Government installation * * *."
 
 
 29
 It appears that although the plaintiffs' letters of May 10 and 13, 1966, were received before an award was made — at least with respect to parcels B-199 and B-201 — it could not reasonably be determined that their late receipt (i. e., after the time set for the opening of the bids) was due "solely to delay in the mails" or "solely to mishandling by the Government after receipt at the Government installation." Actually, the two letters had not even been written at the time set for the opening of the bids, i. e., 11:00 a. m., PDT, on April 26, 1966. Therefore, the plaintiffs' letters of May 10 and 13, 1966, were not sufficient to effect either a modification of the plaintiff's separate bids previously submitted for the purchase of B-198, B-199, and B-201 as individual parcels, or a withdrawal of the bids of B-199 and B-201.
 
 
 30
 Since the plaintiffs, in submitting their bids for the purchase of parcels B-199 and B-201, expressly agreed to be bound by the provisions of the invitation for bids, including the provision pertaining to the forfeiture of a deposit if a bidder failed to consummate the transaction after the acceptance of a bid, it must be concluded that the defendant apparently was authorized to declare a forfeiture of the deposits made by the plaintiffs in connection with their bids for the purchase of parcels B-199 and B-201.
 
 
 31
 Plaintiffs next attack the GSA provision involved as ambiguous and confusing. We think, however, that the bid form provided a clear way for plaintiffs to express their intent to bid for a group of parcels and the later troubles all resulted from plaintiffs' negligent failure to use that form to express their true intent in the way it indicated they should.
 
 
 32
 Finally, we come to the issue of mistake. It is not necessary to establish the following at any length: if a bidder discovers that he has made a mistake in his bid and so advises the contracting officer, even after bid opening, but before award, he is not bound by his bid. Rhode Island Tool Co. v. United States, 128 F.Supp. 417, 130 Ct.Cl. 698 (1955); Alta Elec. & Mech. Co. v. United States, 90 Ct.Cl. 466 (1940); Nason Coal Co. v. United States, 64 Ct.Cl. 526 (1928); Edmund J. Rappoli Co. v. United States, 98 Ct.Cl. 499 (1943). See also Wender Presses, Inc. v. United States, 343 F.2d 961, 170 Ct.Cl. 483 (1965), where a number of other authorities are collated. This does not turn on any fault or ambiguity in the Government specifications, and on the other hand, the contractor need not be free from blame. In all of the cases cited above the bidders were, in fact, guilty of egregious blunders. As we pointed out in Chernick v. United States, 372 F.2d 492, 178 Ct.Cl. 498 (1967), what we are really concerned with is the overreaching of a contractor by a contracting officer when the latter has the knowledge, actual or imputed as something he ought to know, that the bid is based on or embodies a disastrous mistake and accepts the bid in face of that knowledge. The correction of the mistake, perhaps in the teeth of general conditions or specifications, by recision or reformation, represents an application of equitable principles in a legal action. The mistake, to invoke such principles, must be, as in the cases cited, a clear cut clerical or arithmetical error, or misreading of specifications, and the authorities cited do not extend to mistakes of judgment. There is no problem about this here. Defendant's counsel conceded in oral argument that plaintiffs would be entitled to recover if their bid had been mistaken in the manner alleged. This case was referred to the General Accounting Office and their decision, over the signature of Assistant Comptroller Weitzel, and adverse to plaintiffs, is in the record and states the law in harmony with our statement herein.
 
 
 33
 The sole questions in this case thus turn out to be of fact, and are: did the plaintiffs submit the bids they did submit for parcels B-198, B-199, and B-201 in the mistaken belief that this was the way to bid for these three parcels as a group, and not individually, and did the contracting officer accept two of the bids, though he knew or should have known they were mistaken? If the contracting officer made any fact findings, they are not of record, and assuming arguendo that such findings if made would have any validity here, we cannot attach such validity to his bald statement in testimony that there was no mistake. We must find as to that for ourselves.
 
 
 34
 Mr. Michael Ruggiero testified under oath that there was a mistake: that he and his partners intended to bid for parcels B-198, -199, and -201, only as a group and thought the form allowed them to state that intent only in the way they did. "There is always someone who doesn't get the word", and it is for such persons that the law of mistaken bids was invented. But for that unhappy letter of May 13, quot. supra, this sworn testimony might end the matter. Certainly the contracting officer and the GAO were not without reason for viewing anything Mr. Ruggiero might afterwards say with skepticism. It may be doubted, however, if Mr. Ruggiero really expected to be believed in his preposterous statements about the secretary, the carbon paper, etc., knowing as he must have that the addressee of his letter would have the original bid before him. That statement could only have been meant for other eyes. Of course plaintiffs cannot maintain a claim, especially one in equity, by fraud, but we do not consider the statement sufficiently reprehensible of itself to cost Mr. Ruggiero and his partners their entire bid deposits, $11,520.20. Mr. Ruggiero as a witness under oath appears in the record as prudent and careful: his omission to impute any promise to the person he telephoned on April 25, is particularly noteworthy.
 
 
 35
 The surrounding circumstances corroborate Mr. Ruggiero's testimony and establish it as truthful.
 
 
 36
 First, the gap between plaintiffs' bid of $65,101 and the next highest bid of $25,600 for parcel B-199 might well have been enough by itself to raise a doubt in the contracting officer's mind, even if he had not heard from the bidder. The figures of $50,101 as against $36,008 for parcel B-201, if it did not raise further doubts, at any rate would do nothing to resolve doubts already there.
 
 
 37
 A proportionately wide gap in a bid for surplus property — $7,751.51 as against $3,441 — was held of itself insufficient in Wender Presses, Inc., supra, to put the contracting officer on notice of a mistake, but in that case he had not heard of the mistake from the bidder himself before the award, as here. In Alta Elec. & Mech. Co., supra, 90 Ct.Cl. at p. 476 we stated that a range of $25,950 in plaintiff's bid to $31,700, $32,600, and $33,978 in the bids of others should have made defendant suspect the existence of a mistake, even without the notice of mistake prior to award, which in that case was given. The GAO viewed the margins here as without significance in light of the margins in the bids for parcels disposed of to others in the same sale. If the margins stood alone as evidence of mistake the point might have validity, but here they do not stand alone.
 
 
 38
 Second, Mr. Ruggiero testified that major parts of parcel B-199 were practically inaccessible to one who did not have the use of B-198 for the purpose. This was due, not to lack of street frontage, which all three parcels had, but to rugged terrain conditions. The best and "only feasible access" to B-199 was by way of a ravine in B-198. The Government map that was issued to bidders has contour lines on it which tend to confirm Mr. Ruggiero's description, and anyway, there is no contradiction in the record. Defendant neither offered its own description of the terrain nor urged a view. We must assume, therefore, that persons who expected to have the use of B-198 would bid much higher for B-199 than would those who did not have that expectation. This easy and obvious explanation for the discrepancy in the bids for B-199 leaps at us from the record, and no other explanation can be found in it even by digging. The terrain being sold is one of the things the contracting officer ought to know, just as bidders are exhorted to, and it ought to have been obvious to him, at least after the matter was brought home to him, that plaintiffs were probably bidding so much above others for B-199, an inaccessible tract, because they had bid also for B-198 and expected to get both if they got either. While it is not directly in point, we deem it of some help in appreciating the importance of the access question, that in Pikesville Home Builders, Inc. v. United States, 160 Ct.Cl. 541 (1963), we held that a purchaser of Government surplus land could reject the title as unmarketable if the parcel was not accessible from a street the plans showed it as fronting on.
 
 
 39
 Third, the April 25 telephone call, though without significance as an attempted modification of the bid, does have its importance as corroboration of the mistake claim. Plaintiff Michael Ruggiero proved by a telephone bill that he called on that date the number that defendant advertised as the one to call in case anyone had any question about the sale. The person who received the call was not identified or produced by either side. So far as appears, plaintiff had no other business with that office. The correction of a mistaken bid would be the most apparent and legitimate subject for such a call, and even one inclined to doubt his veracity, therefore, would be hard put to doubt his testimony to the effect that he did make the call with that purpose. Our commissioner, who heard him and could judge his demeanor, found as facts that he made that call and raised that question. The significance of this is that the good faith of a mistaken bid claim obviously is strongly supported if the claim is first made before the bids are opened and the awards are known or capable of surmise. Moreover, when a contracting officer's office is told of a mistake through the telephone channel it has itself designated, we do not think the officer can wrap himself in a cloak of ignorance thereof.
 
 
 40
 Our conclusion derives less but perhaps some support from the fact as found that plaintiffs had a plan for development of the property that required ownership of all three parcels. We do not stress it because defendant did not know it before trial, unlike the points we deem vital. It has some tendency to show that the mistake claim is made in good faith, even though the fact remains that an agreement cannot be revised to reflect a plaintiff's subjective understanding the defendant does not and should not know of. Benjamin v. United States, 348 F.2d 502, 172 Ct.Cl. 118 (1965).
 
 
 41
 What it all amounts to is that the plaintiffs had strong motives to bid for the three parcels as a group, and only negative motives to bid for them separately. Separate bids were heavily against their self-interest and would have saddled them with expensive lots of land for which they had no use. This is, we think with their testimony, sufficient to establish that their separate bids were contrary to their true intent and were therefore mistaken in the sense contemplated by the cases. They discovered their mistake promptly, five days after they had made it, and moved promptly to notify the contracting officer, using the channel designated by him. That their call was ineffective to revoke or modify their bids is neither here nor there on the mistaken bid issue. Therefore we conclude that the bids were mistaken in the sense the law contemplates.
 
 
 42
 We do not think plaintiffs are bound by Mr. Michael Ruggiero's unpersuasive attempts to explain why the mistake was made. The law of mistaken bids is made for those mistakes, among others, which are perfectly inexplicable. Anyone who has ever turned into a street in face of a sign that clearly said "one way, do not enter" and tried to explain his action to a policeman, will have a fellow feeling for Mr. Ruggiero. The policeman, of course, thinks it is natural iniquity, as the contracting officer and GAO thought here, but the rest of us know better. Public policy may require that the erring driver be treated as if he were iniquitous, but its command here is to the contrary. If persons seeking to do business with the Government are decently treated by it, there will be more of them and they will offer more favorable terms, while experiences such as the Ruggiero family have undergone, will, if common, cause many to take their business elsewhere.
 
 
 43
 Plaintiffs must also show that the contracting officer overreached them by accepting their bids though he knew or should have known they were mistaken. Chernick, supra. That he actually knew can be ruled out, because his sworn testimony establishes that he did not. But we think he should have known, and did not because of a singular obstinacy in his adherence to error. Before bid opening he was so apprised or should have been by the April 25 telephone call. After bid opening and before award he had two letters to the same effect. These, and the discrepancy in the bids for the inaccessible parcel B-199, should have sufficed to put him on inquiry. He had plenty of time to inquire. It was not until almost a year later that he actually forfeited the bid deposits. The trial before our commissioner occupies only 70 pages of transcript and discloses nothing the contracting officer could not have found out for himself. According to the general conditions, the forfeiture was not automatic. It required an administrative election to forfeit. We believe it was the duty of a contracting officer, with such a choice to make knowing what this one knew, not to take an adamant adversary position at the very outset, but to keep his mind open and conduct some kind of an inquiry, before forfeiting. Since he did not do this, we think the only proper conclusion is to impute to him, as what he should have known, all the facts as they developed in our own trial. The knowledge thus imputed to the contracting officer establishes that he did overreach the plaintiffs by accepting bids he should have known were mistaken. Chernick, supra.
 
 
 44
 We conclude that plaintiffs are entitled to recover their forfeited deposits in this action. Judgment will be entered for plaintiffs in the amount of $11,520.20.
 
 
 
 Notes:
 
 
 *
 Trial Commissioner Mastin G. White heard the evidence and submitted recommended findings and an opinion. Although we disagree with Commissioner White's opinion, we acknowledge the assistance we have received from it and from his findings of fact