## NATIONAL LINE CO., INC.

v.

## The UNITED STATES.

### No. 39–76.

United States Court of Claims.

Oct. 17, 1979.

Samuel F. Schwag, Rapid City, S. D., attorney of record, for plaintiff.

Lynn J. Bush, Washington, D. C., with whom was Asst. Atty. Gen. Barbara Allen Babcock, Washington, D. C., for defendant.

Before DAVIS, NICHOLS and SMITH, Judges.

## OPINION

PER CURIAM:

This case comes before the court on defendant's motion, filed July 26, 1979, requesting that the court adopt the recommended decision of Trial Judge Roald A. Hogenson, Chief of the Trial Division, filed June 12, 1979, pursuant to Rule 134(h), as the basis for its judgment in this case, neither party having filed a notice of intention to except or exceptions thereto and the time for filing pursuant to the Rules of the court having expired. Upon consideration thereof, without oral argument, since the court agrees with the recommended decision, as hereinafter set forth,* it hereby grants defendant's motion and affirms and adopts the recommended decision as the basis for its judgment in this case. Therefore, it is concluded as a matter of law, that plaintiff is not entitled to recover; that defendant is entitled to recover against plaintiff on its counterclaim and, accordingly, judgment is entered for defendant

---

* Although the court adopted the trial judge's separate findings of fact, which are set forth in his opinion, they are not printed herein since such facts as are necessary to the decision are contained in his opinion.

thereon for $242,741.44, plus interest at the rate of 7¾ percent per annum from July 11, 1974. Plaintiff's petition is dismissed.

## OPINION OF TRIAL JUDGE

HOGENSON, Trial Judge: This case is based on a Government supply contract which was terminated for default, with resulting assessment against plaintiff of excess costs of reprocurement. Seeking to have such assessment administratively vacated, plaintiff alleged as its basis before the Armed Services Board of Contract Appeals that the contract should be reformed or rescinded for alleged mistake in bid. The board ruled that it had no jurisdiction of the claim. Originally commenced for relief under the Wunderlich Act, this case was presented to this court on the cross-motions of the parties, raising the threshold issue as to the correctness of the board's jurisdictional ruling. As more fully explained in its order of June 21, 1977, 214 Ct.Cl. 807, the court declined to pass upon the board's holding but, as agreed by the parties, treated this case as if it had been commenced in this court as an action for relief from an alleged mistake in bid, seeking a money recovery based on reformation or rescission of the contract. The court remanded this case to the trial division for initial determination of the merits, directing that:

> \* \* \* The Trial Judge shall utilize the administrative record compiled before the ASBCA, and he shall also allow the parties to present additional evidence if they so request, to the extent necessary or appropriate. [214 Ct.Cl. at 809.]

After amendment of the pleadings to allege a claim for a money judgment, the parties filed their stipulation that they would rely exclusively on the ASBCA record filed in this case, and that no additional evidence or proof would be submitted by them. Such stipulation was approved by the trial judge, and this case has been briefed on the merits. After consideration of the parties' requested findings of fact and objections thereto, based solely on the administrative record applying the standard of preponderance of the evidence, and upon consideration of the legal positions of the parties, it is concluded that plaintiff is not entitled to recover; that defendant is entitled to judgment against plaintiff on its counterclaim in the net amount of $242,-741.44, plus interest at the rate of 7¾ percent per annum from July 11, 1974, and that plaintiff's petition should be dismissed.

On November 15, 1972, defendant by its Defense Personnel Support Center, Defense Supply Agency, Philadelphia, Pennsylvania, awarded to plaintiff, located at Dora, Alabama, Contract No. DSA 100–73–C–0659 for the manufacture of 300,000 small arms ammunition cases, intended for use with M–16 rifles, at the unit price of $1.79, with plaintiff to deliver 3,200 units (called the First Article samples) by January 29, 1973, with deliveries thereafter in monthly increments of 50,000 beginning on April 4, 1973, with the final delivery of 46,800 due September 1, 1973.

Plaintiff failed to produce the initial 3,200 units by January 29, 1973. It did produce and deliver to defendant 3,300 units by March 9, 1973. At a net unit price of $1.29 (deducting from the contract unit price of $1.79 the agreed value of Government-furnished material at $0.50 per unit), defendant owes plaintiff for the 3,300 units the sum of $4,257, which is allowed as a credit to plaintiff on the total excess reprocurement costs. On March 15, 1973, plaintiff advised defendant that it could not financially complete the contract and requested a no-cost termination.

In its limited production experience, plaintiff discovered that it lacked sufficient plant, equipment and personnel to attain the production rate estimated in its bid. It did not take steps to increase output because completion of the contract would have bankrupted the company. It decided against instituting two shifts of contract work, rather than one per workday, because of health problems it would create for its president and vice president and because of lack of other supervisory personnel.

On February 14, 1973, defendant's contracting officer and two other representa-

tives of defendant met with plaintiff's president and discussed the status of the contract. Plaintiff attributed production problems to delays in receipt of components and machinery and advised that it could produce only 25,000 cases per month, in contrast to the 50,000 units per month required by the contract delivery schedule. It was then that plaintiff advised the contracting officer that it could not arrange a second shift of contract work; and that its plant space would not permit the addition of further personnel and machinery. The contracting officer advised plaintiff that its proposed production was unacceptable.

On March 1, 1973, defendant had plaintiff's plant inspected by an industrial specialist to estimate production capability. Plaintiff had only 27 machines, with six sewing operators and one packer then working one shift. It was concluded that plaintiff had the plant capacity with one shift of adequate employees to produce 14,000 cases per month, and possibly 25,000 per month with a two-shift operation. Plaintiff advised that it could not provide two shifts. The industrial specialist estimated that plaintiff would require 90 to 100 machines, operating two shifts, to meet the contract delivery schedule of 50,000 cases per month, and that plaintiff did not have sufficient plant capacity to accommodate the additional equipment.

By letter dated March 3, 1973, plaintiff advised defendant's contracting officer that it had figured the contract item incorrectly, that it should have been advised that it was too low in its price before and not after the contract award; requested an increase in the total unit price from $1.79 to $2.29; stated that if such increase were not allowed contract termination would be requested; and that if plaintiff were assessed reprocurement costs in the amount of the difference between its price and the next higher bidder, plaintiff would be put out of business.

By telegram dated March 8, 1973, defendant's contracting officer denied plaintiff's request for a price increase and issued a 10-day cure notice that plaintiff furnish information that it would correct the condition endangering performance of the contract in accordance with its terms, or else defendant would terminate the contract for default.

By letter dated March 15, 1973, plaintiff advised the contracting officer that it did not know that it had bid too low on the contract until it had produced 3,200 units, and that if no increase in price could be allowed, it could not financially complete the contract, and requested a no-cost termination instead of a default.

By telegram of March 19, 1973, confirmed by formal notice of March 22, 1973, the contracting officer advised plaintiff that the contract was terminated for default as to 296,700 units.

Defendant solicited bids for the reprocurement of the terminated quantity of contract items on March 22, 1973, with the closing date for bids on April 11, 1973. The reprocurement solicitation did not include the First Article review clause of plaintiff's contract, hereinafter quoted, because plaintiff had manufactured and delivered the First Article quantity of items, revealing a satisfactory product, without need for changes in the specifications.

Three bids were received by defendant on the reprocurement solicitation. The low bidder was Rebmar, Inc., at a total unit price of $2.59 with $0.50 per unit allocated to Government-furnished material for a net unit price of $2.09. Two other bidders proposed respectively $3.69 and $3.7842 as total unit prices and $3.19 and $3.2842 as net unit prices after allocation of $0.50 per unit to Government-furnished material.

On April 23, 1973, the Cost Price Analysis Branch of defendant's Defense Supply Agency found the Rebmar bid acceptable at a net unit price of $2.09, because it was the same as the agency's low estimated price objective, and 28.3 percent less than the high estimated price objective.

Dated June 5, 1973, Contract No. DSA 100–73–C–1461 was awarded by the Defense Personnel Support Center to Rebmar, Inc., for the manufacture of the 296,700

ammunition cases terminated for default under plaintiff's contract. Rebmar's total unit price, as awarded, was $2.59, and with a deduction of $0.50 per unit for Government-furnished material, its net unit price was $2.09.

Defendant expended on this reprocurement excess costs in the sum of $246,998.44 and, allowing a credit to plaintiff of $4,257 for the 3,300 units provided by plaintiff, defendant's contracting officer by formal demand directed plaintiff on July 11, 1974, to pay to defendant $242,741.44, with interest on any part unpaid within 30 days at the rate of 7¾ percent per annum from the date of the demand. Plaintiff has never made any payment on such assessment of reprocurement costs.

The parties stipulated before the board that plaintiff does not question the validity of either the default termination or the repurchase award, and that plaintiff does not question the amount of the excess charges. By their stipulation filed herein, the parties agree that the correct amount of excess reprocurement costs is $242,741.44 plus interest.

With the foregoing recital of the post-award facts in this case, it is essential to consider the facts and circumstances prior to the award as they relate to the question as to whether there was a mutual mistake of fact which relieves plaintiff of liability for the excess reprocurement costs.

On August 14, 1972, defendant's Defense Personnel Supply Center issued its solicitation for bids (No. DSA 100–73–R–0123) which resulted in plaintiff's contract. The solicitation stated that any award would be negotiated, and that subject procurement was a Small Business set-aside. The proposed deliveries of the 300,000 ammunition cases were the 3,200 First Article units by December 22, 1972, 50,000 units per month beginning on February 25, 1973, and the final 46,800 units on July 25, 1973.

Similar, but less complex, cases had been previously procured, but such were in short supply and there was need for expeditious delivery to support Marine Corps requirements. Subject case had not been previous-ly procured. It was a newly designed three-pocketed canvas and nylon ammunition case intended for use with the M–16 rifle.

The initial production of 3,200 First Article cases was to be presented to defendant by the contractor at its plant for examination and evaluation pursuant to contract clause C10.86, First Article Approval—Government Testing.

The solicitation and plaintiff's contract provides a newly used "expanded First Article concept" in contract clause C30.92, Review and Analysis of Specifications for Adequacy, stating in pertinent parts:

1. The Government does not expressly or impliedly warrant the adequacy of the Technical Data Package. The Technical Data Package consists of, among other items, specifications, purchase descriptions, patterns and drawings.

2. Prior to and in conjunction with the process and production planning and during production of the First Article under the First Article provisions of this contract, the Contractor shall perform a detailed review and analysis of all Technical Data furnished by the Government. Such review and analysis will include identification and recommended changes to correct deficiencies which may adversely affect production, fabrication or assembly of the contract items in the quantities specified in accordance with all of the Technical Data. Correction of such deficiencies will be made without increase in contract price or extension in delivery schedule and shall be classified as "no cost" changes when they are necessary to attain (i) functional, performance, serviceability and appearance requirements of the applicable Technical Data Package, (ii) compatibility between specified quality assurance provisions and physical or functional requirements of the Technical Data Package, (iii) compatibility between patterns, drawings and other Technical Data, (iv) correction of an impossible or impractical manufacturing or assembly condition, and (v) correction of mutually recognized errors. "No Cost"

changes will be submitted to the PCO, and will be approved or disapproved within five (5) working days of receipt by the PCO. The Government will extend the delivery date in the deliver schedule set forth herein for the First Article and Production Quantities, by the number of calendar days delay beyond the number of days set forth for approval/disapproval. All other changes will be processed in accordance with "Changes" article of this contract.

3. Upon completion of production of the First Article under the First Article provisions of this contract and review and analysis of the Technical Data Package, the Contractor warrants that the end items to be produced and delivered under the contract will meet the requirements of the Government as defined in the applicable Technical Data Package, as supplemented by approved changes and corrections, and will be delivered within the delivery period and at the prices set forth in the contract. The Contractor further warrants that he is responsible for any deficiencies he fails to uncover during production of the First Article and in his detailed review and analysis of the Technical Data Package.

The quoted clause obviously contemplates that errors might be encountered in the technical data package, containing the specifications, purchase descriptions, patterns, and drawings, and allocates the financial responsibility to the contractor to correct any deficiencies in that respect. However, such language does not speak to the problem of assignment of risk in case of a unilateral or mutual misjudgment of costs resulting from inadequacy of plant space, personnel, machinery, or production rate.

On August 16, 1972, defendant's contracting officer had his assigned purchasing agent request their agency's Cost/Price Analysis Branch for assistance in establishing a price objective for subject solicitation. Based on prior procurements of similar items, he estimated that the unit production cost (called CMT for cut, make and trim) was $1.61 and, with $0.29 per unit for Government-furnished material (GFM), his total estimated unit value was $1.90.

Since this was the initial procurement of subject item, difficulty was encountered because of lack of needed technical information, and the report of the Cost/Price Analysis Branch was not furnished to the contracting officer until October 16, 1972, after the receipt of offers by bidders by the closing date of September 14, 1972, on subject solicitation, but before award of the contract to plaintiff.

Prior to submitting its bid, plaintiff had its president review the specifications and drawings, and check its production capability with respect to plant space, equipment and availability of experienced labor. He concluded that plaintiff had sufficient plant space, and had, or had on order, sufficient equipment and available personnel to produce the total quantity of items in accordance with the solicitation. In preparing its bid, plaintiff made a break-down of expected production costs, including material to be furnished by plaintiff, Government-furnished material, labor costs, and overhead and profit. On the labor factor, he considered the applicable hourly rate of pay and the experience of available operators, and estimated their rate of production. While plaintiff had not made any items like subject items, it had made small canvas and nylon products, such as grenade cases, ammunition bags and first aid bags. Plaintiff's president relied upon such experience.

On September 11, 1972, plaintiff submitted its bid on the 300,000 units at a total unit price of $1.79, and with $0.50 per unit allocated to Government-furnished material, its net unit price was $1.29. Three other bidders submitted net unit price bids on the total quantity at $1.95, $2. and $3.

On September 21, 1972, defendant's contracting officer conducted a prenegotiation briefing conference on the subject solicitation with four of his associates in the agency. The contracting officer concluded that plaintiff's offered price was fair and reasonable, that prices for similar items ranged in recent years from $1.33 to $1.50 per unit, but that subject item had more pockets,

thus resulting in additional values for Government-furnished material and labor. The contracting officer's memorandum of the conference recorded that it was decided to check with plaintiff as to whether it understood the provisions of clause C30.92, the above-quoted First Article concept. It was further stated that if plaintiff understood such clause, actions would be initiated for award of the contract to plaintiff.

Within the next few days, as instructed by the contracting officer, the assigned procurement agent telephoned plaintiff's president and inquired whether plaintiff had considered clause C30.92, the expanded First Article concept, in computing its proposed price, explaining that the Government was not guaranteeing accuracy of the specifications and that it would be incumbent upon the contract awardee to refine them. Taking time to check the matter, plaintiff's president returned the call and stated that he understood the ramifications of clause C30.92, had taken it into consideration in computing plaintiff's price, and affirmed that plaintiff's price was valid. This response was relayed to the contracting officer.

On October 11, 1972, the contracting officer's assigned industrial specialist furnished his statement of review of the data and conclusions provided in the preaward survey conducted by representatives of the agency in late September or early October concerning plaintiff's proposed performance.

This review stated that the preaward survey indicated that plaintiff had sufficient machinery and equipment, that plaintiff had produced a similar item in the past, and that plaintiff had in lay-off status skilled operators with experience in the manufacture of such item. The reviewer stated his concurrence with the surveyor's evaluation of plaintiff's production plan and with the recommendation that complete award of the contract be made to plaintiff.

In the preaward survey, plaintiff submitted its production plan designating the types and number of machines and number of operators proposed to be used in production, which information was used by the surveyor to determine whether plaintiff could produce the quantities of items to meet the required delivery schedule. The surveyor accepted plaintiff's estimate that each unit would be produced at a rate of 0.1336 hour per unit, and recommended complete award to plaintiff.

The preaward survey also contained data and information indicating that plaintiff was financially responsible and could obtain bank loans to finance its proposed contract operations.

On October 16, 1972, the previously mentioned report of the Cost/Price Analysis Branch was furnished to the purchasing agent and to the contracting officer. Based on information obtained from the preaward survey and on technical and financial data available, the price analysis was that the estimated fair market net unit price range (excluding GFM) was a low of $1.38 to a high of $2.79. The major difference between the low and high prices was the item of direct labor cost. A labor rate of $2. per hour was used as the average for the industry, furnished by the agency's production branch. As to the low unit price of $1.38, the direct labor item was estimated to be $0.267 per unit by multiplying the labor rate of $2. per hour by 0.1336, the hourly rate of production per unit computed by plaintiff in its bid estimate. As to the high unit price of $2.79, the direct labor item was estimated to be $0.867 per unit by multiplying the $2. per hour by 0.4335, the hourly production rate furnished by the defendant's directorate of manufacturing. The only explanation of the 0.4335 rate is the general statement that it was based on skills, methods and machinery applicable to the directorate of manufacturing.

This report summarized the net unit prices of the four offerors on subject solicitation, indicating plaintiff's as $1.29 and the other three respectively as $1.95, $2.20 and $3. The conclusion was stated that plaintiff's net unit price appeared very low compared with the others as experienced producers, and that the next low bid was 51.5 percent higher than that of plaintiff. It

was stated that plaintiff appeared to have bid on a marginal contract to permit elimination of idle plant capacity, substantiated by the fact that the preaward survey indicated that plaintiff needed 47 additional employees from personnel currently in layoff status. The ultimate conclusion was that plaintiff's net unit price was reasonable.

On October 18, 1972, defendant's contracting officer prepared his price negotiation memorandum summarizing the events and circumstances attendant to subject solicitation, listing the offers received, and proposing award of the contract to plaintiff. He concluded that plaintiff's bid price was fair and reasonable because it was the lowest price received after effective price solicitation. He addressed himself to the price analysis report of the Cost/Price Analysis Branch. He stated that plaintiff had not been requested to furnish cost/price data because the proposed award to plaintiff had been based on adequate price competition. The award to plaintiff was thereafter accomplished by the contract previously described.

In *Ruggiero v. United States*, 420 F.2d 709, 713, 190 Ct.Cl. 327, 335 (1970), the court has clearly stated the controlling principles to be applied in a contract claim based on an alleged mistake in bid, as follows:

* * * As we pointed out in *Chernick v. United States*, 372 F.2d 492, 178 Ct.Cl. 498 (1967), what we are really concerned with is the overreaching of a contractor by a contracting officer when the latter has the knowledge, actual or imputed as something he ought to know, that the bid is based on or embodies a disastrous mistake and accepts the bid in face of that knowledge. The correction of the mistake, perhaps in the teeth of general conditions or specifications, by recision or reformation, represents an application of equitable principles in a legal action. The mistake, to invoke such principles, must be, as in the cases cited, a clear cut clerical or arithmetical error, or misreading of specifications, and the authorities cited do not extend to mistakes of judgment. * * *

Plaintiff's mistake in its bid was unilateral. It was not due to any mathematical miscalculation, clerical error, or omission of a factor essential to an adequate bid. It was due to error of judgment by plaintiff's president as preparer of the bid as to adequacy of plaintiff's plant, equipment, and personnel, and as to the rate of production which plaintiff could attain. Plaintiff first discovered these deficiencies when it was in production on the initial 3,200 items. The preaward survey did not disclose to defendant plaintiff's error in judgment, and there is no evidence establishing fault on the part of the defendant in failing to detect same. It cannot be concluded that defendant overreached plaintiff in awarding the contract on the basis of the bid submitted. The facts and circumstances of this case do not establish that defendant knew or should have known that plaintiff had erred in its judgment in preparing its bid. Plaintiff's problems did not become apparent to defendant until 3½ months after execution of the contract when plaintiff's threatened failure to perform caused defendant to have its industrial specialist review plaintiff's production capability.

Plaintiff has failed to establish that it is entitled to either reformation or rescission of its contract by reason of its judgmental mistake in bid.

## CONCLUSION OF LAW

Upon the findings of fact and the foregoing opinion, which are adopted by the court, the court concludes as a matter of law, that plaintiff is not entitled to recover; that defendant is entitled to recover, that judgment is entered on the counterclaim for defendant and against plaintiff in the sum of two hundred forty-two thousand seven hundred forty-one dollars and forty-four cents ($242,741.44), plus interest at the rate of 7¾ percent per annum from July 11, 1974; and plaintiff's petition is dismissed.