**AYDIN CORPORATION, d/b/a Aydin Energy Systems**

v.

**The UNITED STATES.**

**No. 139–80C.**

United States Court of Claims.

Jan. 13, 1982.

F. Trowbridge vom Baur, Washington, D. C., attorney of record, for plaintiff; Gage, Tucker & vom Baur, Washington, D. C., of counsel.

Frank M. Rapoport, Washington, D. C., with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D. C., for defendant; Joseph P. Duenas, Naval Electronic Systems Command, Washington, D. C., of counsel.

Before DAVIS, NICHOLS and KUNZIG, Judges.

NICHOLS, Judge:

This mistaken bid case comes before the court on the parties' cross-motions for summary judgment. By its motion plaintiff seeks to recover in *quantum meruit* or *quantum valebant* by persuading this court that no contract came into being because of a purported mistake in its bid calculations. The defendant, for its part, seeks to have plaintiff's petition dismissed.

Upon consideration of the moving papers and briefs in support thereof, and oral argument, we conclude that plaintiff's motion should be denied and defendant United States' motion should be granted.

On January 28, 1975, the Naval Electronic Systems Command (NAVELEX) solicited offers for 18 AN/TRC–97A radio sets (hereinafter called radio sets). Because urgency was assigned to this acquisition, formal advertising was suspended in favor of the expedited procedures of direct negotiations with two prior qualified producers of the radio sets. Plaintiff, Aydin, and its competitor, Radio Corporation of America (RCA), submitted bids. No other bids were submitted.

Plaintiff responded to NAVELEX's solicitations offering to furnish the 18 radio sets for a total price of $2,866,808 or approximately $158,800 per unit. RCA's bid was for a total of $3,989,790 or approximately $221,655 per unit, revealing an almost 40 percent disparity between the two.

In March of 1975 defendant conducted an evaluation of the two proposals and their respective prices. Defendant thereafter cleared the award of the contract to plaintiff. Included with the "business clearance" memorandum was a statement in longhand that "[t]he price offered will be verified by the contractor's signature on the bilateral award sheet." The price was never verified with the contractor. It is uncertain what kind of verification the writer had in mind. It may have been only that by signing the contract the bidder would again commit itself to the price it had already quoted. It is therefore not evidence that the writer suspected a mistake. At some time around the end of March in 1975 plaintiff was awarded the instant contract for the production of the 18 radio sets.

In July 1975 plaintiff, through a Freedom of Information Act request, learned of the bid price submitted by its competitor, RCA. On December 5, 1975, plaintiff advised defendant by letter that plaintiff had made a substantial error in the material estimate which was included in plaintiff's bid calculations. Plaintiff contends that on several occasions between July and December of 1975, it orally advised the government that plaintiff had discovered a mistake in bid. The government disagrees that such oral representations were in fact made. The government further contends that even if such oral notice was promptly provided, plaintiff apparently notified persons without contractual authority.

More than 2 years later, on December 19, 1977, plaintiff submitted a claim to the contracting officer under the provisions of 50 U.S.C. §§ 1431–1435, alleging the existence of a mistake in its offer. This mistake, plaintiff claimed, was due to "clerical oversights" which consisted of a failure to estimate quantities and costs of required items, and an omission from its estimate of a standard allowance factor for shrinkage, breakage, and loss of low priced items; "estimating judgment errors," and, finally, "errors in the compilation of the computerized material list." Plaintiff contended that the mistake was so obvious, given the 40 percent discrepancy between its bid and that of RCA, that it should have been apparent to the contracting officer. The contracting officer was then under a duty to verify the bid with Aydin which she failed to do. Accordingly, plaintiff requested an increase in the contract price of $578,879 representing $494,768 in excess material costs, plus $84,111 in general and administrative costs.

NAVELEX denied this claim by letter dated June 7, 1978, citing several factors present at the time of the award which NAVELEX believed provided a reasonable basis to explain the disparity in the offered prices, and adequate support for denying plaintiff's claim. These factors included: plaintiff's ongoing production activity in building and providing spares and assemblies for the Marine Corps and the Air Forces as contrasted with RCA's relative production inactivity; the significant differences in overhead rates between plaintiff and RCA, 125 percent and 194.5 percent, respectively, which by NAVELEX's calculation, accounted for approximately half the difference in prices; the nature of plain-

tiff's errors, namely estimating judgment errors for which the government could bear no responsibility; and the significant hiatus between the date plaintiff first received notice of its competitor's price and its allegation of mistake, July 1975 and December 1975, respectively.

Plaintiff filed a claim for relief with the General Accounting Office (GAO) on September 15, 1978, in the amount of $624,204. Plaintiff once again cited as the basis for its claim the alleged mistake in bid and the failure of the contracting officer to obtain verification. Plaintiff requested that GAO settle the claim by declaring the contract null and void and granting relief on a *quantum meruit* or *quantum valebant* basis.

NAVELEX responded to plaintiff's GAO claim directing attention to the factors outlined above which NAVELEX argued afforded a reasonable basis to explain, in the mind of the contracting officer, the disparity in bid prices and which supported its decision to reject plaintiff's claim. NAVELEX also pointed to two government estimates of $155,000 and $162,134 per radio set, based on prior procurement history, contending that each estimate provided an independent basis to conclude that constructive notice of the alleged mistake should not be imputed to the contracting officer.

On September 6, 1979, the Comptroller General issued an opinion denying plaintiff's claim primarily on the ground that the government estimates were sufficiently close to plaintiff's proposed prices. The Comptroller General relied on this court's decision in *Allied Contractors, Inc. v. United States*, 159 Ct.Cl. 548, 550, 310 F.2d 945, 946 (1962), wherein it was stated that "the discrepancy between plaintiff's bid and the others did not put defendant on notice that plaintiff had made a mistake since its bid was so close to defendant's estimate of the cost."

Plaintiff then filed a request for reconsideration before the GAO, challenging the existence of the $155,000 estimate and disputing the accuracy of the $162,134 estimate contending that it should be $217,916 per unit instead.

On September 6, 1980, the Comptroller General issued an opinion denying plaintiff's request for reconsideration. In its opinion the Comptroller General noted that the issue was not confined to the question of whether the government's estimates were mistaken, but rather whether under the circumstances there was sufficient information available to the contracting officer reasonably to dispel any doubts as to the question of mistake and such that a request for verification of plaintiff's prices would not be necessary. The Comptroller General found that such information was available and that upon evaluating this information, concluded that the contracting officer could not reasonably be charged with constructive knowledge of a mistake in plaintiff's offer.

Plaintiff brought suit in this court on March 25, 1980, for the difference between the original contract price and one of three alternatively computed values of the radio sets furnished defendant.

I

In its opposition, defendant argues that plaintiff's motion for summary judgment must fail because (1) plaintiff has failed to prove whether in fact plaintiff made a mistake, and (2) that the kind of mistake claimed, even if shown, is at least in part not one for which this court affords relief. We agree with defendant in the latter proposition.

█ Mr. Augustus Schneidau, president of Aydin Systems Division of Aydin Corporation since 1976, submitted an affidavit in support of plaintiff's motion. Before 1976, Mr. Schneidau was the vice president of Aydin Energy Systems. In his affidavit, Mr. Schneidau asserts that plaintiff orally notified defendant on several occasions that Aydin had discovered a "substantial mistake in the material estimate," and once by letter that Aydin had "discovered a serious defect in the material estimate." Mr. Schneidau further asserts that the error was inadvertent and in the amount of $494,768 in material cost, plus $84,000 in general and administrative costs.

Rule 101(f), which governs the form and content of affidavits presented in support of motions for summary judgment, provides in part: "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."

While plaintiff's moving papers demonstrate a scarcity of facts supporting the existence of a mistake, we are not inclined to support defendant's extreme position of requiring facts that would "prove" the existence of a mistake. In our view, Mr. Schneidau's position as vice president of Aydin Energy Systems, demonstrates for purposes of a motion for summary judgment, that he was sufficiently competent to testify as to the existence, discovery, and notice to defendant of the purported error. In this regard we therefore hold that the requirements of Rule 101(f) are met.

We cannot however, sustain plaintiff's motion for summary judgment because plaintiff has not shown that the type of mistake herein alleged is one for which this court will afford relief.

In our decision, *National Line Co. v. United States*, 221 Ct.Cl. 673, 607 F.2d 978 (1979), we reaffirmed the application of principles to "mistake in bid" cases that our decisions in *Ruggiero v. United States*, 190 Ct.Cl. 327, 420 F.2d 709 (1970), and *Chernick v. United States*, 178 Ct.Cl. 498, 372 F.2d 492 (1967), helped fashion. *National Line Co. v. United States*, 221 Ct.Cl. at ——, 607 F.2d at 984. In *Ruggiero*, we stated that "[t]he mistake, * * *, must be, as in the cases cited, a clear cut clerical or arithmetical error, or misreading of specifications, and the authorities cited do not extend to mistakes of judgment." 190 Ct.Cl. at 335, 420 F.2d at 713. *See also Tony Downs Foods Co. v. United States*, 209 Ct.Cl. 31, 41, 530 F.2d 367, 373 (1976); *American Ship Building Co. v. United States*, —— Ct.Cl. ——, 654 F.2d 75 (1981).

In face of the above authorities, plaintiff's case seems constructed on the thesis that a bidder's mistake of judgment will invalidate an agreed contract price. Plaintiff's "substantial mistake in the material estimate" appears to be nothing more than that plaintiff simply underestimated the cost of materials, hence its bid. Plaintiff's moving papers do not attempt to show that the material estimate mistake was a "clear cut clerical or arithmetical error," nor is there any claim of misreading specifications. At oral argument, plaintiff's counsel was unable to add to its moving papers. Help on this point is partially afforded plaintiff if we look, not to its own submission, but to the text of and the exhibits attached to defendant's reply and cross-motion for summary judgment.

In a letter to NAVELEX dated December 19, 1977, of the $494,768 in excess material cost, plaintiff attributed $107,212 to "clerical oversights.". The remainder (thus the greater part) was attributed to "estimating judgment errors, and errors in the compilation of the computerized material list." (Deft.'s Exhibit 10, p. 2) To the extent that such errors were *judgment* errors, relief is precluded by our *Ruggiero* decision, *supra*. Very likely plaintiff simply assumed its material vendors would adhere to previous prices in face of the then current inflation; at least that it happened this way is nowhere ruled out.

Plaintiff's "clerical oversights" are described in the above letter as consisting of "(1) failing to estimate quantities and costs for several hundred items listed 'as required' on the computerized mailing list, and (2) omitting the standard nonproductive allowance (NPA) factor (3%) for shrinkage, breakage and loss of low priced items * * *." Some of these arguably could be shown to be clear cut mathematical or clerical errors. Defendant relies on *Eriez Magnetics Corp. v. United States*, 209 Ct.Cl. 673 (1976), for the proposition that the omission of materials required in the specifications from the cost computations constitutes inefficient or bad judgment, for which no legal or equitable remedy is available. We are unwilling to follow that oversimplified treatment of the case. First, *Eriez, supra*, was a congressional reference

case and though well reasoned, is not a binding precedent on this court. Second, following a low bid due to the omission of required materials in the estimate and numerous other irresponsible errors on the part of the bidder, defendant requested confirmation of bid price or verification, saying it did so because of the variance between plaintiff's low bid and other bids, which suggested the possibility of error. The verification was negligently and inefficiently performed. The casual treatment of it was rightly held to be a mistake in judgment. There was no request for verification in this case. Third, as we pointed out in *Ruggiero, supra,* contractor negligence is not in and of itself a bar to relief. The court stated that "the contractor need not be free from blame. In all of the cases cited above the bidders were, in fact, guilty of egregious blunders." 190 Ct.Cl. at 335, 420 F.2d at 713.

The "clerical oversights" and compilation errors, without more specific facts, do not fall into the "clear cut clerical or arithmetical error" camp. Neither do they clearly constitute errors of judgment. Giving them the most favorable reading for plaintiff, they are but a minor part of the adjustment claimed, and of the entire procurement. Defendant contests the nature of the error claiming it was due to bad or inefficient judgment. There is evidence on the record to indicate otherwise. The availability of judicial relief depends significantly on the nature of the mistake alleged. We think on summary judgment, in view of the nature of its burden, plaintiff should have been far more specific as to the nature of the mistakes it says occurred, and the money allocable to each mistake. Summary judgment is therefore unavailable to plaintiff and its motion must be denied. Whether defendant could have summary judgment on this issue by itself we need not decide.

## II

■ Where (unlike the case in *Ruggiero*) a mistake in bid is not alleged until after the contract is awarded, this court has stat-ed "[i]t is plain that plaintiff may recover only if defendant's responsible officials, knew or should have known of the mistake at the time the bid was accepted." *Wender Presses, Inc. v. United States,* 170 Ct.Cl. 483, 485, 343 F.2d 961, 962 (1965). Plaintiff does not claim that the contracting officer actually knew of the alleged mistake at the time the bid was accepted. Indeed, in view of the sparse and nebulous description of the mistake presented in plaintiff's moving papers, plaintiff would be hard pressed even to allege actual knowledge much less prove its existence. Plaintiff does, however, contend that the almost 40 percent disparity in the two bids that came before the contracting officer, placed her on constructive notice of the error, that the acceptance of this bid without verification did not result in an enforceable contract, and that since the work has been performed and accepted by the government, recission is not feasible, therefore plaintiff is entitled to payment on a *quantum meruit* or a *quantum valebant* basis.

■ The test for constructive notice in cases dealing with mistake in bids is whether under all the facts and circumstances of the case "there were any factors which reasonably should have raised the presumption of error in the mind of the contracting officer * * *." *Chernick v. United States,* 178 Ct.Cl. at 504, 372 F.2d at 496.

■ The mere disparity between bids does not automatically lead to the conclusion that the test for constructive notice has been satisfied. *Wender Presses, Inc. v. United States, supra; United States v. Sabin Metal Corp.,* 151 F.Supp. 683 (S.D.N.Y.), *aff'd,* 253 F.2d 956 (2d Cir. 1958); *Alabama Shirt & Trouser Co. v. United States,* 121 Ct.Cl. 313 (1952). Indeed we have stated that—

It does not necessarily follow, however, that a variance in bids inevitably leads to a finding of imputed knowledge on the part of the defendant. *Compare Jansen v. United States,* 170 Ct.Cl. 346, 357, 344 F.2d 363, 370 (1965) (100 percent variance; no imputed knowledge), *and Wender Presses, Inc. v. United States,* 170

Ct.Cl. at 488, 343 F.2d at 964 (125 percent variance; no imputed knowledge). * * * [*Bromley Contracting Co. v. United States*, Ct.Cl., 652 F.2d 70 (1981).]

Further, it is clear from our decisions that price disparity alone does not constitute constructive notice where there are other factors that would negate the inference of error when it would otherwise be reasonable to infer one. *Bromley Contracting Co. v. United States, supra; Wender Presses, Inc. v. United States, supra; Allied Contractors, Inc. v. United States, supra.* As such, where circumstances exist at the time of bid evaluation which offer reasonable explanations for the disparity between bids, the *Wender Presses* test of reasonableness is satisfied. This approach, we believe, strikes a balance between the dual concerns of "overreaching of a contractor by a contracting officer," *Ruggiero v. United States*, 190 Ct.Cl. at 335, 420 F.2d at 713, on the one hand, and the need to avoid making it necessary for the contracting officer "to act as a 'nursemaid' for bidders." Doke, *Mistakes in Government Contracts— Error Detection Duty of Contracting Officers.* 18 S.W.L.J. 1, 11 (1964). [Hereinafter referred to as "Doke."] The procurement process requires that contracting officers be most cautious about doing anything to discourage low bidders from bidding low. *American Ship Building Co. v. United States*, —— Ct.Cl. at ——, 654 F.2d at 80.

Applying the above principles to the instant fact situation, it cannot be concluded, upon the basis of the record presented on these motions, that the disparity in bids constituted constructive notice of mistake. When, as here, there are only two bids, that one is so much higher may only mean the higher bidder did not want the contract very much. The fact that, as here, the high bidder is not currently in the business of supplying the item, would make that explanation even more plausible.

A most significant factor is the existence of substantially equivalent government estimates. There were in this case two such estimates, the validity of which plaintiff vigorously challenges. While for purposes of a motion for summary judgment one of the estimates would probably be insufficient to support our finding for defendant, it appears to us that the other estimate does suffice.

One estimate was prepared by the contracting officer, Anna H. Schwartz. This estimate was based on procurement costs of the same type of radio set obtained by defendant from plaintiff in a 1970 procurement. The contracting officer applied a 12 percent inflation rate to the bid unit price of the previous NAVELEX contract with plaintiff and obtained a $162,134 estimate which closely approximated plaintiff's bid of $158,000 per unit.

The other estimate was termed an "independent engineering estimate" of $155,000 per unit. This estimate, according to the contracting officer's affidavit, was before her and was considered by her at the time she conducted a price analysis of Aydin's bid. Therefore, in addition to other types of information used in her price analysis, the contracting officer had before her two estimates ostensibly prepared by different branches of the Navy involved in the purchasing activity.

Plaintiff, however, challenges the accuracy of the "final" estimate figures. Plaintiff contends that the cost estimated by NAVELEX of $162,134 per unit was based on a false premise. The basis for plaintiff's contention is revealed by referring to plaintiff's Exhibit B. Exhibit B is a copy of a memorandum prepared by the Navy. It is essentially an evaluation of the price bid by Aydin. The memorandum dated March 1, 1975, points out with regard to Contract N00039-71-C-0314 (AES) of October 23, 1970, that for 26 radio sets, Aydin had bid and charged a unit price of $103,348. This unit price included the price of antennae. Although the instant contract involves radio sets without antennae, in arriving at its estimate, NAVELEX made an allowance for antennae and subtracted that sum from its extrapolation which was based on the $103,348 figure. In the "remarks" column of the memorandum, appearing in the row which corresponds to the $103,348 unit price

is the following notation: "2 Step IFB FFP, Comp. actual contractor cost approx. $135K ea." Plaintiff insists that the NA-VELEX estimate should have been based on the "actual contractor cost" of approximately $135,000 per unit rather than the 1970 Aydin contract price. We do not agree.

In Doke's article, *supra*, it is stated that: "[a] comparison of current prices with the prices paid under prior procurements is particularly significant in evaluating proposals under *negotiated* procurement." [Emphasis in original.] 18 S.W.L.J. at 25.

Further, the Armed Service Procurement Regulation then in effect, (ASPR, presently called the Defense Acquisition Regulations, DAR) ASPR 3–807.2(b)(1) provides in pertinent part:

Price analysis may be accomplished in various ways including the following:

* * * (ii) the comparison of prior quotations and contract prices with current quotations for the same or similar end items * * *.

(v) the comparison of proposed prices with estimates of cost independently developed by personnel within the purchasing activity.

The emphasis here in the above quotations is on a comparison of previous contract prices with current bids. In making her estimate, the contracting officer properly focused her inquiry on a comparison of the offered price to the prices of previous acquisitions. Indeed, as between the two figures, the contract price actually paid was certainly the more reliable of the two in view of the fact the ostensible "actual contractor cost" was an approximation by the very terms of the notation.

We are not unmindful of the fact that plaintiff is here seeking to impute to the contracting officer knowledge of plaintiff's "actual contractor cost" for the purposes of making her estimate, and by virtue of this litigation, seeking to relieve itself of its own "estimate," the instant bid price, in spite of the fact that plaintiff was, or should have been, in a better position to ascertain its own "actual costs." If it is true, in the words of plaintiff's president, that Aydin "took a shellacking" because in 1970 Aydin bid $103,348 while it cost approximately $135,000 to produce each unit, then the contracting officer could certainly expect from Aydin that it would exercise additional caution in a subsequent bid. The contracting officer cannot be held to a higher standard in making her estimate than the bidder, who for obvious reasons is in a better position to ascertain the facts upon which to base its estimate. Plaintiff does not contend that the 1970 contract price was mistaken in any way, therefore, that price appears to be a reasonable basis for price comparison. The 1970 excess of cost over price was a curious fact, but the contracting officer knew plaintiff had sold subsequent units to various customers since that first 1970 production. She might infer plaintiff had had ample opportunity to learn of any cost pitfalls, and the benefit of the "learning curve" would work contrary to inflation. In *American Ship Building, supra*, we approved a focus by contracting officers on prior price rather than prior cost when they believed contractor negligence had enhanced the costs.

■ Plaintiff also challenges the "engineering estimate" of $155,000 per unit on the ground that "it was a figure picked out of the air," therefore "lacking any substantive force." There are no factual indications from defendant which would demonstrate how this estimate was prepared, and consequently its reliability might be called into question. If this were the only estimate here involved, the dearth of facts supporting the reliability of this estimate might be decisive. However, the issue here is not so much whether the estimates in question were accurate, but whether the contracting officer acted in good faith in evaluating the bids, discharging her error detection duty, and did not overreach the contractor. *See* Doke, *supra*, 18 S.W.L.J. at 23, *Ruggiero v. United States*, 190 Ct.Cl. at 335, 420 F.2d at 713. Plaintiff does not contend that the contracting officer did not have the estimates in question before her at the time she evaluated the bids. Reliance

on a government estimate discharges the contracting officer's error detection duty as regards constructive notice of error based on bid disparity, if such estimate is in line with the bid alleged to be mistaken. *Allied Contractors, supra.* This result obtains unless the contracting officer knows or has reason to know that the government estimate is erroneous. *See* Shnitzer, *Government Contract Bidding* at 473.

 As we have pointed out, the NAVELEX estimate of $162,134 was prepared under reasonable circumstances. Plaintiff does not challenge the methodology used in preparing the NAVELEX estimate. We find no fault with the contracting officer's decision to award the contract to Aydin on the basis of what we conclude to be reasonable evaluation procedures.

This conclusion is bolstered by other factors known to the contracting officer at the time she conducted the bid evaluation. These factors include: the fact that plaintiff had a significantly lower overhead rate than its competitor, RCA; the fact that Aydin, in its bid proposal cover letter of February 26, 1975, represented itself as "currently building and providing spare modules and assemblies * * * for the U. S. Marine Corps and the U. S. Air Force * *;" and finally, in the same letter Aydin states: "while we have submitted a totally responsive bid, we did find several areas of potential cost-savings to the U. S. Government." The obvious implication of this latter quote being that it was possible to do the job at an even cheaper price if defendant would change the specifications.

In *Allied Contractors, supra,* we held that the contracting officer was not on constructive notice of error in the low bid, because the difference between the award of the low bid and the government estimate for such items was not significant. 159 Ct.Cl. at 550, 310 F.2d at 946. In *Bromley Contracting Co., supra,* we held that the government was under no duty to verify a bid where the plaintiff's bid was 39 percent lower than the next lowest bid and 12 percent lower than the government estimate. The contracting officer has the task of evaluating a low bid to determine, among other things, if there is enough possibility of a mistake to require a call for verification. This was not, here, an easy or obvious decision, but given all the facts, we cannot say they sufficed to indicate bad faith or overreaching, under our many precedents. Further, as per our analysis in part I of this opinion, to the extent plaintiff's errors constitute errors of judgment, defendant must prevail in its motion for summary judgment.

### III

 On cross-motions for summary judgment, counsel are deemed to represent, unless they state otherwise, that all the relevant facts are before the court and a trial is unnecessary. If they hope anything of further discovery they need only say so. We therefore do not remand for trial on the basis of our supposed ability to conceive of the existence of further documents or testimony that might, if produced, develop or close fact issues. If on a party's own presentation, resolving all actual and present evidentiary conflicts in his favor, he fails to make a case, he must expect summary judgment against him. That is the situation plaintiff is in here.

Accordingly, plaintiff's motion for summary judgment is denied and defendant's cross-motion is granted. Plaintiff's petition is therefore dismissed.