ESSEX ELECTRO ENGINEERS,
INC., Appellant,

v.

The UNITED STATES, Appellee.

Appeal No. 26–82.

United States Court of Appeals,
Federal Circuit.

March 11, 1983.

Baldwin, Circuit Judge, filed opinion dissenting in part.

Charles E. Raley, Arlington, Va., argued for appellant. With him on the brief were Eugene F. Shine and Israel & Raley, P.C., Arlington, Va.

Sandra P. Spooner, Washington, D.C., argued for appellee. With her on the brief were Asst. Atty. Gen. J. Paul McGrath and Richard W. Oehler, Washington, D.C.

Before BALDWIN, Circuit Judge, COWEN, Senior Circuit Judge, and SMITH, Circuit Judge.

EDWARD S. SMITH, Circuit Judge.

This is an appeal from the decision of the Department of Transportation Contract Appeals Board[1] (board), in which the board determined the amount of the uncompensated cost of performance of a contract, terminated for convenience, between the Federal Aviation Administration (FAA) and Essex Electro Engineers (Essex). The board found that Essex was entitled to an equitable adjustment of $124,709 plus interest, but refused additional recovery for burden and profit[2] either on materials returned to suppliers or canceled prior to delivery. The board also held that Essex had elected to proceed under the Contract Disputes Act of 1978[3] (act) and therefore was entitled to interest only from the date it certified its claims pursuant to the act. We *affirm* in all respects.

## I.

On June 15, 1978, the FAA awarded Essex a fixed-price contract (in the amount of $504,142) for 35 diesel engine generator sets. Before commencing production, Essex was to provide drawings and prototype units for Government inspection and testing. Essex was unable to produce prototypes acceptable to FAA contracting offi-cials, and so on March 12, 1979, the contracting officer terminated the contract for default.

Essex appealed the default termination to the board under the disputes clause of the contract on March 14, 1979. The board docketed the appeal on July 16, 1979, and notified Essex in a letter of that date. The board enclosed a copy of its new rules and procedures under the Contract Disputes Act (which had become effective on March 1, 1979), and asked Essex to choose the procedure under which it wanted to proceed. The letter did not refer to the act, but the enclosed rules were headed by a note explaining applicability of the act and of the rules and clearly presenting the option to proceed under the act or to follow the procedures in effect when the contract was entered. By letter dated August 6, 1979, Essex chose to have a hearing before the board under one of the new procedures implementing the act.

On August 15, 1979, Essex filed a complaint with the board, requesting conversion of the default termination to a termination for the convenience of the Government and requesting an equitable adjustment of $327,694 (65 percent of the total contract price) for its uncompensated cost of performance under the contract. Pursuant to an agreement between counsel, Essex submitted a quantum schedule (settlement proposal) to the Government on February 22, 1980, detailing the source of the costs in its complaint. On February 26, 1980, Essex also amended its complaint to add a breach of contract claim for $419,244.

The quantum schedule was treated by the board as a claim submitted to the contracting officer and the Government therefore

---

1. *Essex Electro Eng'rs, Inc.,* 81–1 B.C.A. ¶ 14,-838 (DOTCAB Nos. 1025 & 1119), *on motion for reconsideration,* 81–1 B.C.A. ¶ 15,109.

2. The term "burden" means overhead and is computed by multiplying the contractor's direct costs (including contract material costs) incurred in performance of the terminated contract by an agreed upon factor, in this case 30.87%. Profit is also computed by multiply-ing the contractor's direct costs by an agreed upon factor, in this case 22.54%.

3. Pub.L. No. 95–563, 92 Stat. 2383, codified at 41 U.S.C. §§ 601–613 (Supp. V 1981). The changes in the act made by the Federal Courts Improvement Act of 1982, Pub.L. No. 97–164, 96 Stat. 25, are not relevant to resolution of the issues raised in this case.

requested an order from the board directing Essex to certify its claim pursuant to section 6(c)(1) of the act, 41 U.S.C. § 605(c)(1). Essex contested this motion on the ground that certification was not required by the act under the circumstances; it did not challenge the applicability of the act. The board ordered Essex to file an appropriate certification, and Essex accordingly certified that the complaint and the quantum schedule were accurate and submitted in good faith. The certification was received by the contracting officer on April 12, 1980.

Soon after the hearing before the board began, the parties reached a partial settlement agreement in which the default termination was converted into a termination for the convenience of the Government, leaving the board to decide the amount due Essex "as if the Contract had been terminated for the convenience of the Government." The board found that Essex was not entitled to include the cost of material returned to suppliers or canceled prior to delivery as part of the incurred direct costs of performance for the purpose of calculating burden and profit. The board also held that, by choosing to proceed under the board rules implementing the act, Essex had elected to proceed under the act. Accordingly it held that interest accrued from April 12, 1980, the date on which Essex certified its claims pursuant to section 6(c)(1) of the act.

On appeal we will first address the allowability of burden and profit on returned and canceled materials. Having thus resolved the underlying claim, we will turn to the question of when interest begins to accrue under the act, pausing first to consider the threshold issue of the validity of Essex's election to proceed under the act.

## II.

### A.

Essex contends that it should be able to recover burden and profit on materials returned for credit to suppliers due to termi-

nation of the contract. It argues that the applicable regulations permit it to include the cost of these materials in computing its direct costs of performance recoverable in the case of a termination for convenience. According to Essex, burden should be calculated from the material costs and then profit should be calculated from the material costs plus burden. After these three items (material costs, burden, and profit) are totaled, Essex would deduct the cost of the returned materials as a credit to the Government. The result would be that while Essex never paid for the returned materials, nor used them in performance of the contract, it would still recover formulaically derived collateral expenses based on the materials.

In contrast to the complex and lengthy argument that Essex constructs to reach this result, we believe that the matter is rather simply resolved by the relevant Federal Procurement Regulations. The provision that covers return of property to suppliers as a result of a termination for convenience,[4] 41 C.F.R. § 1–8.502–2 (1982), reads, in pertinent part:

> Contractors shall not include in their settlement proposals the cost of such property returned to suppliers in accordance with this paragraph. Contractors may include in their settlement proposals as "other costs" the transportation, handling, and restocking charges with respect to the property so returned.

The regulation is straightforward. Costs not actually incurred are not to be charged to the Government. Therefore materials returned for credit—and thus not paid for by the contractor—should not be charged. It follows that if the cost of returned materials may not be included, costs based on such materials are also not to be included.

There are, of course, expenses associated with the acquisition and return of materials, which are legitimately part of the direct costs of performance. These are the costs which Essex seeks to recover by

---

**4.** We consider entirely without merit appellant's contention that § 1–8.502–2 does not apply because this case really involves a termination for default. The parties' agreement, described above, settled the question.

applying burden to the cost of returned materials. Section 1–8.502–2, however, covers these costs with its provision for "other costs." As the "other costs"—transportation, handling, and restocking charges—are roughly what is covered by burden, the regulation must be construed to *replace* a percentage charge for burden, because otherwise the contractor could obtain double recovery on these items. The regulations's requirement of itemization of "other costs" [5] also precludes the possibility of a percentage burden. Profit as a cost is simply not allowed by the regulations.

This arrangement is reflected in a companion provision of the Federal Procurement Regulations, 41 C.F.R. § 1–8.502–1, which describes the handling of property retained for use in other Government contracts:

> [H]andling and transportation charges necessitated by the purchase or retention of such property may be included in the contractor's settlement proposal as "other costs," if such costs are reasonable.

Both sections reflect a policy that the Government be charged only what the contractor ended up paying, and can account for. Burden and profit, appropriate as general expenses of doing business and completing a contract, are not necessarily appropriate to the termination situation in which the Government's essential obligation is to pay for work actually done at the pro rata price agreed upon in the original contract. The regulations clearly adopt the position that these expenses are not appropriate, and, the regulations being reasonable, we are bound to follow them.

Essex also relies on subsections (e) and (h) of clause 37 of the contract, "Termination for Convenience of the Government." Those subsections read, in pertinent part:

> (e) * * * the Contracting Officer * * * shall pay to the Contractor the amounts determined as follows:
>
> \* \* \* \* \* \*
>
> (2) The total of—

> (i) The costs incurred in the performance of the work terminated, including initial costs and preparatory expense allocable thereto, but exclusive of any costs attributable to supplies paid or to be paid for under paragraph (e)(1) hereof;
>
> (ii) The cost of settling and paying claims arising out of the termination of work under subcontracts or orders, * * * which are properly chargeable to the terminated portion of the contract (exclusive of amounts paid or payable on account of supplies or materials delivered or services furnished by subcontractors or vendors prior to the effective date of the Notice of Termination, which amounts shall be included in the costs payable under (i) above); and
>
> (iii) A sum, as profit on (i), above * * *
>
> \* \* \* \* \* \* .

> (h) In arriving at the amount due the Contractor under this clause there shall be deducted (1) all unliquidated advance or other payments on account theretofore made to the Contractor, applicable to the terminated portion of this contract; (2) any claim which the Government may have against the Contractor in connection with this contract; and (3) the agreed price for, or the proceeds of sale of, any materials, supplies, or other things acquired by the Contractor or sold, pursuant to the provisions of this clause, and not otherwise recovered by or credited to the Government.

Essex reads subsection (h) to mean that the deduction of the costs of returned materials is the "final step" in computations, necessarily preceded by the application of burden and profit. This reading is bolstered, in Essex's view, by subsection 37(e), which provides that "costs incurred in the performance of the work terminated" will be included in the amount paid to the contractor. Essex argues that the cost of returned materials was a cost recorded on its books and so clause 37(e) requires that burden and profit be applied against this incurred cost, that is, the cost shown on appellant's books on the date of termination.

---

**5.** Item 5 of the format for § 1–8.502–2 claims requires itemization. *See also* 41 C.F.R. § 1– 8.307–1(c) (general requirement that a settlement proposal be in "reasonable detail").

■ As with section 1–8.502–2, we are unable to find such richness and complexity in this apparently straightforward provision. We cannot discern in clause 37(h) a mandatory order of performance of calculations, to say nothing of a requirement that burden and profit be applied. Whatever it is worth, such a vague indication could not in any case be interpreted to override the applicable regulations, nor do we see any evidence in the contract of an intent to do so. By contrast, the board's reading of subsection (e)—that an "incurred cost" for purposes of a settlement proposal is the net amount remaining after credits have been deducted—is reasonable and harmonizes section 1–8.502–2 with clause 37. We therefore adopt the board's interpretation.

## B.

At the time the contract was terminated, Essex had ordered, but had not paid for, certain materials in anticipation of performance. These orders were canceled for credit prior to delivery. Essex relies on substantially the same arguments for adding burden and profit to the cost of returned materials to support its request for burden and profit on canceled materials.

■ Although the regulations do not expressly refer to canceled materials, the underlying policy in section 1–8.502–2 of disallowing material costs not *actually* incurred, but allowing legitimate associated costs (transportation, handling, reasonable cancellation or return charges, etc.), applies equally to canceled materials. Accordingly, we agree with the board that section 1–8.-502–2 logically extends to canceled materials and requires the exclusion of the cost of canceled materials from the settlement proposal for any purpose, including the calculation and assessment of burden and profit. To the extent that costs associated with

canceling those materials can be established, they would be recoverable as "other costs."

## III.

The board held that Essex could only recover interest from the date on which its claims were certified pursuant to the Contract Disputes Act. The threshold issue is whether the contractor elected to proceed under the act or under the disputes clause of the contract.

## A.

Before enactment of the Contract Disputes Act, a contractor could pursue two kinds of claims: claims for equitable adjustments under the disputes clause of the contract and claims for breach of contract. Disputes clause claims could be heard and decided by contracting officers and by boards of contract appeals, from which limited judicial review was available in the Court of Claims.[6] The contracting officers and boards were not permitted to decide breach claims, however, which were taken directly to the Court of Claims.[7]

The Contract Disputes Act to a certain extent unified the process. Section 6(a) of the act, 41 U.S.C. § 605(a), provides that "[a]ll claims by a contractor against the government relating to a contract" (emphasis supplied) are to be first submitted to the contracting officer for decision. Furthermore, under section 8(d), 41 U.S.C. § 607(d), a board of contract appeals can "decide *any* appeal from a decision of a contracting officer" (emphasis supplied), with limited review by this court, pursuant to section 10 of the act, 41 U.S.C. § 609. Hence, only by election to proceed under the act can a contractor have a breach of contract claim heard by a contracting officer or board of contract appeals.

---

**6.** 41 U.S.C. §§ 321–322 (1976) (Wunderlich Act). The standard of review is:

" * * * any such decision shall be final and conclusive unless the same is fraudulent or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence." 41 U.S.C. § 321. The Court of Claims was limited to the

record before the board. *United States v. Carlo Bianchi & Co.,* 373 U.S. 709, 714, 83 S.Ct. 1409, 1413, 10 L.Ed.2d 652 (1963).

**7.** *United States v. Utah Constr. & Mining Co.,* 384 U.S. 394, 412, 86 S.Ct. 1545, 1555, 16 L.Ed.2d 642 (1966).

The Contract Disputes Act applies to all contracts entered into after March 1, 1979. Its applicability to contracts entered into before March 1, 1979, is governed by section 16, 41 U.S.C. § 601 note, which provides, in pertinent part:

Notwithstanding any provision in a contract made before the effective date of this Act, the contractor *may elect* to proceed under this Act with respect to any claim pending then before the contracting officer or initiated thereafter. [Emphasis supplied.]

The present contract was entered into on June 15, 1978, and the contracting officer rendered his first decision on March 12, 1979, so Essex could proceed either under the act or under the disputes clause in the contract.

 There is no statutory or regulatory provision detailing the way in which this election is to be made, so the only real requirement is that the election be informed and voluntary.[8] As an initial matter, Essex cannot be heard to argue that it was uninformed. The rules sent to Essex by the board clearly referred the contractor to the act and set out the options available to a contractor in Essex's position.

 We conclude that Essex did in fact voluntarily elect to proceed under the act. From the choice of a procedure in April 1979 through the hearing of the combined appeals, Essex consistently indicated that it wanted the case to be considered under the act. Its basis for opposition to certification was disagreement over the requirements of the act, not the applicability of the act. Essex presented a claim for breach of contract to the board, which was permissible only under the act. Finally, counsel for Essex made this statement on the record at the beginning of the hearing before the board on the combined appeals:

Before I call my next witness, your Honor, there is [*sic*] some preliminary matters I would like to take up with the Board and with the counsel.

First, of course, we are here under the Contract Disputes Act of 1978 and so Appellant has put in no testimony and intends to put in no evidence on the rate of interest to be applied to any award which this Board should find appropriate.

In light of these actions and statements, we hold that the board's finding that Essex voluntarily elected to proceed under the act was supported by substantial evidence.

### B.

The Contract Disputes Act also includes an interest provision which supersedes the interest clauses in the contracts litigated under the act.[9] Section 12 of the act, 41 U.S.C. § 611, reads:

Interest on amounts found due contractors on claims shall be paid to the contractor *from the date the contracting officer receives the claim pursuant to section 605(a)* of this title from the contractor until payment thereof. The interest provided for in this section shall be paid at the rate established by the Secretary of the Treasury pursuant to Public Law 92–41 (85 Stat. 97) for the Renegotiation Board. [Emphasis supplied.]

This case presents the question whether section 12 means that interest should run from March 1, 1979, the effective date of the act,[10] or from April 12, 1980, the date the claim was *certified* to the contracting officer.

This issue is fully considered in *Fidelity Construction Co. v. United States,* decided

---

**8.** *Tuttle/White Constructors, Inc. v. United States,* 656 F.2d 644, 647–48 (Ct.Cl. 1981).

**9.** *See Tuttle/White Constructors,* 656 F.2d at 647. The interest clause of Essex's contract provided that interest would accrue "from the date the Contractor furnishes to the Contracting Officer his written appeal under the Disputes clause." This would have been March 14, 1979.

**10.** Even though the contracting officer first received the claim prior to March 1, 1979, it has been settled that interest under the act may not be recovered for periods of time prior to its effective date. *See Brookfield Constr. Co. v. United States,* 661 F.2d 159, 162–66 (Ct.Cl. 1981).

recently.[11] On the basis of a complete discussion of the act, its structure, and its legislative history, the court held that it would be inconsistent to allow a contractor to base its interest claim on the act without also requiring the contractor to comply with the act's basic requirements. Certification of claims of more than $50,000 being a fundamental part of the statutory scheme, the contractor cannot recover interest until it complies with the certification requirement.[12] There are no material differences between this case and *Fidelity* with respect to this issue, so the discussion and conclusion in *Fidelity* will serve for this case as well.

We would only add that this resolution is also mandated by the approach that the Court of Claims has taken in previous certification cases. The basic case, *Paul E. Lehman, Inc. v. United States,* held that "unless a claim has been properly certified, it cannot be considered under the statute." [13] Without certification, "there is simply no claim that this court may review under the Act." [14] Following this rationale, in *Skelly & Loy v. United States* the court held that, with respect to contracts entered into after the act, failure to certify requires dismissal of the entire case because "the defect relates to the very foundation of the statutory scheme—the claim before the contracting officer." [15]

*W.H. Moseley Co. v. United States,* decided before *Skelly & Loy,* considered other implications of *Lehman.*[16] It began by reaffirming that the certification requirement was jurisdictional for the Court of Claims and that the contracting officer can neither waive the requirement nor determine with finality whether it has been satisfied in a particular case. The court then held that, in view of the importance of the requirement, all of the statements required by section 6(c)(1) must be made simultaneously by the contractor, and—most importantly—that certification cannot operate retroactively.[17] This holding controls the case at bar.

■ It can only be concluded that the certification requirement is the *sine qua non* of a claim under the act for more than $50,000. It would be completely at odds with the statutory scheme as developed in the Court of Claims—and especially at odds with the nonretroactivity holding in *Moseley*—to allow interest on a claim prior to its certification.[18] Having concluded that Essex knowingly elected to proceed under the act and was aware of its terms, we have no choice but to limit the interest recovery because Essex failed expeditiously to certify its claims as the act plainly requires.[19]

We therefore conclude that the board correctly determined the quantum of recovery

---

11. *Fidelity Constr. Co. v. United States,* 700 F.2d 1379, 1382–1385 (C.A.Fed.1983).

12. *Id.*

13. *Paul E. Lehman, Inc. v. United States,* 673 F.2d 352, 355 (Ct.Cl.1982).

14. *Id.* (citing with approval board decisions holding the same with respect to board review). *See also Skelly & Loy v. United States,* 685 F.2d 414, 418 & n. 12 (Ct.Cl.1982).

15. *Skelly & Loy,* 685 F.2d at 418.

16. *W.H. Moseley Co. v. United States,* 677 F.2d 850, 851–52 (Ct.Cl.1982).

17. *Id.,* 677 F.2d at 852.

18. In the face of these cases, we do not find the arguments advanced against a certification prerequisite convincing. The absence of reference to certification in § 12 of the act (the interest provision) is of no significance because certi-

cation, in our view, is a prerequisite for the entire act, which need not be restated in each section. For example, certification is not mentioned in the judicial review provisions (§ 10, 41 U.S.C. § 609), but it was held no less an absolute prerequisite to Court of Claims jurisdiction for that fact. *Moseley,* 677 F.2d at 851.

Nor do the references in the legislative history to compensation for the cost of money, *see* S.Rep. No. 1118, 95th Cong., 2d Sess. 32, 1978 U.S.Code Cong. & Ad.News 5235, 5266, persuade us. Compensation is the purpose of *all* interest provisions and it has not caused the courts to recognize a general entitlement to interest in the absence of an explicit provision therefor. *See Fidelity Constr. Co.* (700 F.2d at 1383); *United States v. N.Y. Rayon Importing Co.,* 329 U.S. 654, 658–59, 67 S.Ct. 601, 603, 91 L.Ed. 577 (1947); *Bromley Contracting Co. v. United States,* 596 F.2d 448, 450 (Ct.Cl.1979).

19. *See Moseley,* 677 F.2d at 852.

allowable to Essex and correctly applied interest under the Contract Disputes Act from April 12, 1980, the date on which the claim was certified to the contracting officer.

AFFIRMED.

BALDWIN, Circuit Judge, dissenting in part.

I dissent from the conclusion that interest runs from the date Essex certified its claim. I would instead follow the express language of the interest provision and permit contractors to collect interest from the date their claim is submitted to the contracting officer. This approach would give Essex interest from February 22, 1980, the date its claim was submitted to the contracting officer.

The majority's opinion amends the clear language of the interest provision and brushes aside Congressional intent. My reasons for disagreeing with the majority are set forth in my dissent on this same issue in *Fidelity Construction Company v. United States,* 700 F.2d 1379 (C.A.Fed. 1983).

Nies, Circuit Judge, concurred and filed an opinion.