**BCM CORPORATION, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 686–81C.

United States Claims Court.

April 26, 1983.

Joel S. Rubinstein, Washington, D.C., for plaintiff. Jill A. Kotvis, Sadur & Pelland, Chartered, Washington, D.C., of counsel.

Richard W. Oehler, Washington, D.C., with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D.C., for defendant. Terry Hart Lee, General Services Admin., Washington, D.C., of counsel.

## OPINION

NETTESHEIM, Judge.

This dispute, which is before the court on cross-motions for summary judgment pursuant to the Wunderlich Act, 41 U.S.C. §§ 321–22 (1976), arises out of a contract awarded to plaintiff BCM Corporation ("BCM") by the General Services Administration ("GSA") for improvement in the electrical capacity of the old State Department Building in Washington, D.C. The General Services Administration Board of Contract Appeals ("GSBCA" or the "Board") rejected BCM's claim by decision issued November 26, 1980, *BCM Corp.,* GSBCA, 80–2 B.C.A. (CCH) ¶ 14,798, *aff'd on rehearing,* GSBCA, 81–1 B.C.A. (CCH) ¶ 15,147.

BCM by its petition seeks an equitable adjustment for work performed under protest, contending that GSA was on notice, either actual or constructive, of an error in BCM's bid and failed properly to discharge its duty to verify that bid. In its cross-motion for summary judgment, BCM also argues that its interpretation of the contract

specifications was reasonable and, therefore, should prevail over defendant's.

## FACTS

The following factual recapitulation is consistent with the Board's opinion, as amplified by facts in the record that are not inconsistent with the Board's findings of fact.

GSA issued an invitation for bids on Contract No. GS–00B–02657 to be opened August 17, 1976. The invitation was in two volumes, Volume I of which related to general and technical requirements (the "specifications"). By way of orientation to the work that forms the subject of BCM's claim, electrical power comes into the State Department through a basement switchboard, where it is distributed by a system of feeders to panelboxes on each floor. The contract called for replacement of panelboards inside panelboxes, installation of new panelboxes at new locations, and connection of new feeders from the new panelboxes back to the old panelboards (then referred to as "pullboxes").[1] The dispute precipitating this court's review is that GSA took the position that the contract called for installation of feeders running from the switchboard to the old panelboxes ("the subject feeders"), whereas BCM interpreted the contract to exclude this work.

The specifications included written specifications, drawings, and notes. An item known as a "Feeder Schedule" listed 60 items. The following is an excerpt from this schedule, relied upon as illustrative by the Board:

1. A short glossary of the terms in the case follows: The "switchboard" is the central distribution point for electricity in the building. A "panelbox" contains a "panelboard" and is the point for distribution of electricity on each floor by "branch circuits" to the wall outlets, light fixtures, and so on. If the main current is routed through an old panelboard/box to a newly-installed "panelboard/box," the old panelboard/box becomes a "pullbox." The connection between these units is accomplished by "feeders" defined by the National Electric Code (incorporated into section 1605.-2.2 of the contract specifications) as "circuit conductors," *i.e.,* insulated wires. The circuit conductors/feeders, in turn, are housed in "conduits."

# FEEDER SCHEDULE

| DESIGNATION | CONDUIT SIZE | CONDUCTORS | FROM | TO |
|---|---|---|---|---|
| B-1 | EXIST. | 4-#300MCM & 1#3 GND. | EXIST. SWITCHBOARD | PANEL B-1-N |
| 1-1 | EXIST. | | SUB-FEED LUGS IN PNL. B-1-N | PANEL 1-1-N |
| 2-1A | 2½" | | TAP IN P.B. 2-1 | PANEL 2-1-N |
| 3-1 | EXIST. | | EXIST. SWITCHBOARD | THRU P.B. 2-1 & P.B. 3-1 TO PNL 3-1-N |
| 3-1A | 2½" | | P.B. 3-1 | PANEL 3-1-N |
| 4-1A | 2½" | | TAP IN P.B. 4-1 | PANEL 4-1-N |
| 5-1 | EXIST. | | EXIST. SWITCHBOARD | THRU P.B. 4-1 & P.B. 5-1 TO PNL. 5-1-N |
| 5-1A | 2½" | | P.B. 5-1 | PANEL 5-1-N |
| 6-1A | 2½" | | TAP IN P.B. 6-1 | PANEL 6-1-N |
| 7-1 | EXIST. | | EXIST. SWITCHBOARD | THRU P.B. 6-1 & P.B. 7-1 TO PNL. 7-1-N |
| 7-1A | 2½" | | P.B. 7-1 | PANEL 7-1-N |
| BG | EXIST. | 4# 1/0 & 1# 6 GND | EXIST. SWITCHBOARD | PANEL BG |

GSBCA, 80–2 B.C.A. (CCH) ¶ 14,798, at 73,030.

BCM, per its bid estimator, construed the Feeder Schedule as signifying that a feeder included both conduit and conductor. Thus, when the conduit size was marked "EXIST.," it also included the conductor. The abbreviation "EXIST." coincided with existing switchboards. BCM inferred from the foregoing that replacement of the conductors running from the switchboard to the old panelboxes was not required.

GSA estimated the project would cost $300,000. On August 17, 1976, the Government opened the following bids:

| | |
|---|---|
| Lowry & Donnath, Inc., & L. T. Souder, Inc., a joint venture ("LD/S") | $189,300 |
| Tunnel Electric Construction Co. ("Tunnel") | $229,850 |
| BCM Corporation ("BCM") | $248,000 |
| M. C. Dean Electrical Contracting, Inc. | $290,381 |
| Kennedy Electric Co., Inc. | $294,294 |
| Union Light and Power Co. | $298,298 |
| Pel-Bern Electric, Inc. | $318,000 |
| Chatman Electric Services, Inc. | $369,540 |
| G & C Construction Corp. | $397,078 |

On August 18, 1976, the contracting officer sent LD/S, the low bidder, a bid verification request noting that an error was suspected because LD/S' bid was below the GSA estimate and out of line with other bidders on the project. The verification request was accomplished by checking the third box of three on a pre-printed form.[2] The form letter also stated that if an error had been made, the original worksheets and subcontractor and material quotations should be furnished to the contracting officer, along with an explanation of the mistake and a revised bid.

2. The three boxes stated: 1) "Below the government estimate."; 2) "Out of line with the other bidders."; 3) "Below the government estimate and out of line with other bidders on the project . . ., we suspect a mistake in bid." The Board decision reproduces this form at GSBCA, 80–2 B.C.A. (CCH) ¶ 14,798, at 73,033.

LD/S' counsel telephoned the contracting officer, stating that his client's bid was based upon its interpreting the specifications not to require removal and replacement of the subject feeders. This interpretation was confirmed in a letter dated September 7, 1976. On September 27, 1976, the contracting officer rejected LD/S' bid as nonresponsive, because replacement of the subject feeders was an essential requirement of the contract.

The contracting officer on September 20, 1976, sent Tunnel and BCM identical verification requests with the third box checked as had been issued to LD/S. Although the contracting officer was aware of LD/S' interpretation regarding the subject feeders, neither bid verification request mentioned it.

Tunnel's response to the verification request identified a $10,923 mistake and, as was required in such cases, submitted Tunnel's worksheets to substantiate the error. Examination of the worksheets revealed that Tunnel had included replacement of the subject feeders, contrary to LD/S' interpretation. Tunnel's bid, however, was rejected as non-responsive for reasons immaterial to the issues on this appeal. BCM responded to the verification request by letter of September 24, 1976, stating: "We have reviewed the specification requirements on the above-referenced project and find a bid price of $248,000 ... to be correct." [3] On November 2, 1976, GSA awarded the contract to BCM.

A pre-construction meeting was held on December 3, 1976, at which BCM surfaced its interpretation that it did not consider the removal and replacement of the existing feeders to be within the contract specifications. BCM was advised to direct its views to the construction engineer, which was accomplished by letter of December 9, 1976. On March 16, 1977, the GSA project officer sent a letter to BCM stating in pertinent part:

We call your attention to the specifications Section 1605, paragraph 1.2 which reads:

1.2 The work includes but is not limited to the following principal systems and equipment.

(1) Removal of existing feeders, disconnection at switchboard and panelboards.

(2) Removal of existing panelboard interiors.

(3) Furnishing and installing new panelboards, feeders.

Drawing 9–E–7 is a general drawing including information on requirements for panels and feeders.

In view of the above it is considered a contract requirement for you to provide new feeders. . . .

BCM advised on March 22, 1977, that the work would be performed under protest.

Upon BCM's claim the contracting officer issued on April 26, 1977, a final decision highlighting the points that appeared in the March 16 letter. BCM then appealed. In rejecting BCM's appeal, the Board held that BCM's interpretation of the specifications concerning the subject feeders was unreasonable and that the contracting officer properly had verified BCM's bid. GSBCA, 80–2 B.C.A. (CCH) ¶ 14,798. On reconsideration the Board affirmed its decision, GSBCA, 81–1 B.C.A. (CCH) ¶ 15,147, modifying two minor findings of fact. Thereafter, BCM filed its petition in this court on November 24, 1981. Briefing on the parties' cross-motions was completed on March 10, 1983, and oral argument followed on April 15, 1983.

## DISCUSSION

 Judicial review of this Wunderlich Act case is limited. The court—after review of the entire record—must accept the factual determinations of the Board, unless they are unsupported by substantial evidence, fraudulent, so erroneous as to show bad faith, or arbitrary and capricious. The

---

**3.** In fact, BCM's estimator testified that he did not review the plans and specifications in verifying the bid, but checked his take-off (the part of the estimate procedure whereby quantities are derived from the plans and specifications) for numerical, extension, mathematical, and calculation mistakes.

legal conclusions of the Board, however, are not accorded the finality that its factual determinations receive. *E.g., Teledyne Lewisburg v. United States,* 699 F.2d 1336, 1353–1355 (C.A.Fed.1983); *see Essex Electro Engineers, Inc. v. United States,* 702 F.2d 998, 1002 n. 6 (C.A.Fed.1983).

▮ Despite BCM's urging that substantial evidence is lacking to support certain findings,[4] at issue here are conclusions of law. The question whether the contracting officer fulfilled his duty to verify is a question of law. *Wender Presses, Inc. v. United States,* 170 Ct.Cl. 483, 487, 343 F.2d 961 (1965) (applying test of reasonableness to whether facts of case should have adduced suspicion of mistake). *See also* J. Cibinic & R. Nash, *Government Contract Claims* 251 (1981) (ultimate legal consequence drawn from any given set of facts is a question of law). Insofar as the reasonableness of BCM's interpretation of the contract was a basis for the Board's decision, the proper interpretation of the provisions of the contract is a question of law. *Teledyne Lewisburg v. United States,* 699 F.2d at 1338; *see Liles Construction Co. v. United States,* 197 Ct.Cl. 164, 455 F.2d 527, 535–36 (1972) (citing *Kaiser Industries Corp. v. United States,* 169 Ct.Cl. 310, 330–31, 340 F.2d 322, 334 (1965)).

▮ Two rules of government contract law apply to this case. They are discussed in the order adopted by both the Board decision and defendant's cross-motion. First, in the performance of a contract, the construction given to the contract by the contractor, if within the zone of reasonableness, will prevail over the Government's

interpretation under the principle of *contra proferentem.* A second rule in federal government contracts, based upon a rationale of good faith, is that the Government must accept reformation or rescission of a contract after a contracting officer accepts a bid with the actual or constructive notice of an error in that bid. If the bidder's unilateral mistake is borne by the bidder in performance of the contract—without additional compensation in money or revision of performance terms—the mistake is imputed to the Government because of a presumption that the contracting officer is guilty of bad faith through overreaching. In cases of constructive notice, the presumption of bad faith can be rebutted by the contracting officer if he properly verifies the bid.

### The Reasonableness Issue

The Board ruled that BCM's interpretation of the contract not to include replacement of feeders running from the switchboard to old panelboards was unreasonable and denied recovery on this basis. GSBCA, 80–2 B.C.A. (CCH) ¶ 14,798, at 73,032.[5] According to the Board, an inference that the Feeder Schedule abbreviation "EXIST." in the conduit column also applied to the adjacent conductor column (signifying that such conductor was not to be replaced) was inconsistent with both the express contract specification for removal and replacement of feeders and the contract purpose of upgrading the electrical capacity of the building. The omission of an explicit statement that the specified conductors marked an increase in capacity over the existing conductors was discounted by the Board, be-

---

4. For example, BCM contends that substantial evidence supports a finding that GSA examined Tunnel's bid for the purpose of determining its treatment of the subject feeders and that the Board incorrectly determined that this examination was merely incidental to substantiating Tunnel's error.

5. Defendant did not argue before the Board that a patent ambiguity existed regarding the subject feeders, which would have created an exception to the otherwise applicable rule of *contra proferentem* and required BCM to resolve the ambiguity prior to bidding. *E.g., Enrico Roman, Inc. v. United States,* 2 Cl.Ct. 104,

106–107 (1983) (SETO, J.) (*held,* patent ambiguity where both contract ambiguity and the bidder's admission of the need to inquire while on pre-bid inspection existed); *Sofarelli Assoc. v. United States,* 1 Cl.Ct. 241, 247 (1982) (HOGENSON, J.) (*held,* patent ambiguity where contractor had knowledge of existence of switch wiring ambiguity from a prior contract it performed, and specifications omitted instructions on installation and wiring of subject switch); *see A & K Plumbing & Mechanical, Inc. v. United States,* 1 Cl.Ct. 716, 722 (1983) (SETO, J.).

cause the building's age and the contract purpose made replacement of existing feeders "obvious". GSBCA, 80–2 B.C.A. (CCH) ¶ 14,798, at 73,032.

Defendant argues that the Board's conclusion was correct and marshals a number of facts in support, all of which were relied on by the Board. The specifications, section 1605 "WORK INCLUDED," ¶ 1.1 states in part: "This section of the specifications includes the furnishing and installation of complete electrical systems for power, lighting and other services . . . ." Paragraph 1.2 provides that the work includes "[r]emoval of existing feeders" and "[f]urnishing and installing new panelboards, feeders." The National Electric Code ("NEC"), which was incorporated into the contract by reference in section 1605.2.2, defines a feeder as "[a]ll circuit conductors between the service equipment, or the generator switchboard of an isolated plant, and the final branch-circuit overcurrent device." Regarding the disputed Feeder Schedule, the abbreviation "EXIST." did not appear in the conductor column; rather, specifications for conductors were marked for each designation. Defendant further notes that the cover of the specification document reads in part: "PROJECT[:] INCREASE ELECTRICAL CAPACITY STATE DEPARTMENT BUILDING, WASHINGTON, D.C.," and argues that the statements in the project purpose and section 1605 could not be achieved if existing conductors were left in place.

An additional factor noted by both the Board and defendant was that the General Requirements provision of the specifications, section 1605.10.2.1, required THHN insulated conductor, a thinner insulation than that used in 1939 when the State Department building was constructed. Use of the thinner insulation allowed conductors of larger diameter to be run through existing conduit. The Board observed that the existing conductor could not be as large as the new, thinner-sheathed conductor and, therefore, would be incompatible with the larger capacity of the new conductor to which the old conductor was attached.

GSBCA, 80–2 B.C.A. (CCH) ¶ 14,798, at 73,031.

BCM argues that the Board erred in rejecting its interpretation of the contract as unreasonable, drawing on the rule that "[When] [b]oth plaintiff's and defendant's interpretation lie within the zone of reasonableness . . . . [i]f some substantive provision of a government-drawn agreement is fairly susceptible of a certain construction and the contractor actually and reasonably so construes it, in the course of bidding or performance, that is the interpretation which will be adopted . . . ." *Blount Brothers Construction Co. v. United States,* 171 Ct.Cl. 478, 495, 346 F.2d 962, 972 (1965) (citations omitted); *WPC Enterprises, Inc. v. United States,* 163 Ct.Cl. 1, 6, 323 F.2d 874, 876 (1963). BCM interpreted feeder to mean both conductor and conduit as a unit and consequently applied "EXIST." in the conduit column of the Feeder Schedule to the conductor column, as well. On this basis BCM asserts as reasonable the conclusion that new feeders were required only from existing panelboards to new panelboards, which were the designations where the word "EXIST." does not appear.

The facts cited in support of BCM's position are the omission from the Feeder Schedule drawings and notes of installation instructions for feeders from the switchboard to old panelboards, although instructions for new panelboards and for feeders from the old panelboards to the new panelboards were included. Detailed drawings were supplied for the removal and replacement of feeders between the existing and new panelboards, but were omitted for the subject feeders. The specification drawings did not include information from which the length of the subject feeders could be measured. When BCM was required to replace the subject feeders, its estimator measured their length by a field inspection.

To refute the Board's conclusion that only by replacing the subject feeders could the contract purpose of increasing the electrical capacity of the building be accomplished, BCM notes the absence of an indication in the specifications of the subject feeders'

capacity. When the dispute over the feeders and their capacity arose, GSA's construction representative did not make a visual inspection of the feeders—an onerous task given their position behind ceilings in existing offices. Instead, he referred to the original 1939 drawings of the building to determine the capacity of the subject feeders in order to rebut BCM's position that they were of adequate capacity. These 1939 drawings were not available to bidders prior to the contract award.

BCM's contentions reveal how, past a certain point, it reasonably could have been led to omit the subject feeders from replacement. The Feeder Schedule includes both conduit and conductor specifications, see *supra* at 3, even though defendant itself notes that the NEC definition of feeder is limited to conductor. This gratuitous inclusion of conduits, many marked to remain in place, coupled with the conductor specifications (for example, in the Feeder Schedule excerpt largely consisting of an arrow running from the second through the eleventh site designations) standing alone could lead a reasonable contractor to conclude that the conduits marked "EXIST." were to stay in place. The omissions in the drawings and notes are to similar effect. The fact that GSA referred to drawings unavailable to BCM to determine existing conductor/feeder capacity—rather than making a difficult on-site inspection—detracts from defendant's contention that BCM should have done what it did not do itself: make an onsite inspection.

Despite the foregoing factors, the analysis of the reasonableness of BCM's position never proceeds to the point where they can be considered. The critical language on this issue is the wording of section 1605.1 and its explicit reference to the "removal of existing feeders," as well as to their replacement. The Board adopted this reading as determinative, and the court agrees.

■ The contractor has a duty to read all of the specifications in a solicitation. *Dale Ingram, Inc. v. United States,* 201 Ct.Cl. 56, 70, 475 F.2d 1177, 1184 (1973). Section 1605.1 resolves any potential confu-

sion that might otherwise have been present in the Feeder Schedule and its use of the abbreviation "EXIST." in the conduit column. On the whole, the specifications cannot be reasonably read to exclude the subject feeders from replacement. BCM misread the specification and made an unreasonable mistake in its bid, as the Board correctly held.

*The Verification Duty*

■ Concluding that BCM made an unreasonable mistake when it bid on the State Department project does not foreclose BCM's other theory of recovery based on the contracting officer's failure properly to verify BCM's bid. FPR 41 C.F.R. § 1–2.-406–1 (1980) ("section 406–1"), reads as follows:

> In cases of apparent mistakes and in cases where the contracting officer has reason to believe that a mistake has been made, he shall request from the bidder a verification of the bid, calling attention to the suspected mistake.

This language is a corollary to the common law of government contracts expressed in cases such as *Ruggiero v. United States,* 190 Ct.Cl. 327, 420 F.2d 709 (1970); *Chernick v. United States,* 178 Ct.Cl. 498, 372 F.2d 492 (1967); and *Wender Presses, Inc. v. United States,* 170 Ct.Cl. 483, 343 F.2d 961 (1965). If the contracting officer is on notice, actual or constructive, of a bidder's mistake; fails properly to verify the bid; and subsequently accepts the bid, a presumption then arises that the contracting officer has acted in bad faith and taken advantage of the bidder, and reformation will be permitted. *Ruggiero v. United States,* 190 Ct.Cl. at 335, 420 F.2d at 713. The Board rejected BCM's argument based on breach of GSA's duty to verify. GSBCA, 80–2 B.C.A. (CCH) ¶ 14,-798, at 73,034–35.

The precise reasoning for the Board's rejection of this argument is difficult to discern. According to the Board, BCM argued that the contracting officer failed to comply with section 406–1 at a time when he was on notice that BCM shared LD/S' interpretation that the specifications did not require

replacement of the subject feeders. The Board also characterized BCM as arguing that GSA was bound by BCM's interpretation, whether or not it was reasonable. GSBCA, 80–2 B.C.A. (CCH) ¶ 14,798, at 73,-034. BCM, the Board states, incorrectly focused on the time the bid was verified, although the time of acceptance of the bid is the relevant moment. GSBCA, 80–2 B.C.A. (CCH) ¶ 14,798, at 73,034–35. At the latter moment, the contracting officer had evidence which suggested "no more than a mere possibility that appellant's bid excluded replacing all existing feeders." GSBCA, 80–2 B.C.A. (CCH) ¶ 14,798, at 73,034.

The Board distinguished BCM's principal case, *Framlau Corp.,* IBCA, 61–2 B.C.A. (CCH) ¶ 3,116, on the ground that its discussion of the contracting officer's duty to verify consisted of *dicta.* *Framlau* held "that the specifications were latently ambiguous and that Framlau's interpretation was reasonable." GSBCA, 80–2 B.C.A. (CCH) ¶ 14,798, at 73,035. Because BCM's interpretation of the contract was unreasonable, it follows that the contracting officer could not have had constructive knowledge of BCM's interpretation. Any assumption by the contracting officer that BCM had made this interpretation would have been "pure speculation" when BCM's bid was $59,000 higher than the similarly mistaken bid of LD/S. Given that Tunnel, the next bidder below BCM's, included replacement of the subject feeders in its bid, "a contrary interpretation of appellant's bid [would have been] an act of sheer folly." GSBCA, 80–2 B.C.A. (CCH) ¶ 14,798, at 73,-035.

BCM challenges the Board's understanding of the law on the duty to verify and asserts that the Board ignored the facts that should have created that duty. The court deems it difficult to determine whether, indeed, the Board concluded that an unreasonable contract interpretation by a bidder estops the creation of a duty to verify. Many indications are present that this error was made, however.

The Board began its examination of this issue by noting, "Once again we will deal with appellant's interpretation that the contract did not require it to replace existing feeders from where they began at the basement switchboard to the point where they entered the existing panelboards...." GSBCA, 80–2 B.C.A. (CCH) ¶ 14,798, at 73,-032. BCM's reliance on *Framlau* was rejected, as discussed, because Framlau's interpretation was reasonable and the comments on the duty of verification were relegated to *dicta.* "The case was decided on the basis of a contractor's reasonable interpretation of its contract. Such a conclusion we have already rejected in the appeal before us." GSBCA, 80–2 B.C.A. (CCH) ¶ 14,798, at 73,035. The Board's opinion does not set forth the law or otherwise state the contracting officer's duty to verify a bid. In addition to *Framlau,* the cases that the Board cited on the issue, *Gresham & Co. v. United States,* 200 Ct.Cl. 97, 470 F.2d 542 (1972); *Abe L. Greenberg, Inc. v. United States,* 156 Ct.Cl. 434, 300 F.2d 443 (1962); and *Cresswell v. United States,* 146 Ct.Cl. 119, 173 F.Supp. 805 (1959), deal with resolution of conflicts of contract interpretation between contractors and the Government. They do not address bid verification. The Board distinguished these inapposite cases because they involved reasonable—and prevailing—contract interpretations, whereas in this case the contracting officer knew only of an unreasonable interpretation by another bidder, LD/S. GSBCA, 80–2 B.C.A. (CCH) ¶ 14,798, at 73,035. The Board's opinion fairly can be read to reflect an apprehension that a contracting officer is not required to verify unreasonable contract interpretations.

■ The law, nevertheless, is that if a contracting officer is aware of facts and circumstances which reasonably should have given rise to the presumption of error in the bid under consideration, he has a duty to verify the bid, by calling attention to the specific error suspected, whether or not that error is reasonable. *Ruggiero v. United States,* 190 Ct.Cl. 327, 420 F.2d 709 (cited with approval in *Aydin Corp. v. United States,* 229 Ct.Cl. ——, 669 F.2d 681, 685 (1982)). Contrary to the Board's intimation,

the reasonableness of the mistake is not relevant to the creation or discharge of the verification duty, and "the contractor need not be free from blame. In all of the cases cited above the bidders were, in fact, guilty of egregious blunders." *Ruggiero v. United States,* 190 Ct.Cl. at 335, 420 F.2d at 713 (quoted in *Aydin Corp. v. United States,* 669 F.2d at 686).

A number of circumstances can give rise to the duty to verify a bid, two of which are present here. An oft-cited article, Doke, *Mistakes in Government Contracts—Error Detection Duty of Contracting Officer,* 18 S.W.L.J. 1 (1964) ("Doke"), delineates these general categories: (1) facially apparent errors, such as multiplication errors made when computing unit prices into total price; (2) disparity in prices among the bids; (3) disparity between the bid and the private government estimate; (4) disparity between the bid and the cost of prior procurements of the same item; (5) disparity between the bid price and, if the contracting officer knows it, the market value for the goods. Doke at 16–26. BCM's bid was 82 percent of the Government's $300,000 estimate and, like those of LD/S and Tunnel, was out of line with the other bids.[6]

▮ Not all mistakes can be corrected by the contracting officer's failure properly to verify. Making clerical or mathematical errors or misreading the specifications qualifies, but a mistake of judgment does not. *Aydin Corp. v. United States,* 669 F.2d at 685. This case involves a misreading of the specifications so as not to include replacement of the subject feeders and, therefore,

is a proper candidate for reformation for a mistake in bid under this requirement.[7]

No dispute exists that the contracting officer had a duty to verify BCM's bid; the issue is whether he properly discharged that duty. Doke suggests that duty is discharged if the contracting officer communicates the reason he suspects a mistake. "If the very purpose of the request for verification is to establish the good faith of the contracting officer, can the request itself be in good faith if less than full disclosure is made to the bidder of all facts or circumstances which have led the contracting officer to suspect the possibility of error?" Doke, at 35–36. In this case the contracting officer noted the bid disparity, but held back the amount between BCM and the government's estimate, a procedure that has been employed in other decisions of the Comptroller General, *see General Electric Co.,* Unpub.Comp.Gen. B–148,325, Mar. 23, 1962; *see supra* note 6, as well as the error made by LD/S. The contracting officer's full knowledge was not communicated to BCM. The form verification used was more akin to the "good faith by checklist" approach, *i.e.,* a cursory and standard step in the procurement process, which was rejected in *United States v. Metro Novelty Manufacturing Co.,* 125 F.Supp. 713 (S.D.N.Y. 1954).

In *Clarke Enterprises,* ASBCA, 82–1 B.C.A. (CCH) ¶ 15,627, the Board held that a contracting officer had not discharged adequately his duty to verify a suspected mistake on a bid when, in requesting verification, she failed to note the wide disparity between the government estimate and the

---

**6.** The difference between BCM's bid and the next lowest bid, $42,381, was significantly greater than the average difference between any two of the higher bids: $42,381, versus an average of $9,206. See *supra* at 3; *cf. Duquesne Painting Co.,* Unpub.Comp.Gen. B–148,-481, Apr. 3, 1962; Doke at 20–21. Unpublished decisions of the Comptroller General are cited herein merely as illustrative. *Cf. Chernick v. United States,* 178 Ct.Cl. 498, 505, 372 F.2d 492, 496 (1967). Both parties cited these opinions in support of their contentions.

**7.** BCM's complaint requests relief in the nature of an equitable adjustment. The boards of contract appeals prior to the Contract Disputes

Act of 1978, 41 U.S.C. §§ 601–613 (Supp. V 1981), held that jurisdiction was lacking over reformation claims grounded in mistake. J. Cibinic & R. Nash, *Government Contract Claims, supra,* 47. When the Court of Claims granted relief for improper verification, it did so using the label of reformation, *see Chernick v. United States,* 178 Ct.Cl. at 506, 372 F.2d at 497. To the extent this difference should become material, the court notes that it has read the entire record, and its determination that substantial evidence supports the Board's findings can be construed in this case as *de novo* findings of fact.

bidder's bid. "Good faith dealing with bidders requires that all relevant information be brought to their attention in situations such as exist here." ASBCA, 82–1 B.C.A. (CCH) ¶ 15,627, at 77,185. In the present case, the contracting officer similarly held back the amount of the Government's estimate, as well as the possible misinterpretation of the requirements regarding the subject feeders.[8]

Defendant argues that the contracting officer was not on notice of any particular mistake by BCM. Nowhere in its brief, however, or in the Board's opinion, does defendant elicit a reason why the contracting officer was constrained from communicating to BCM a complete disclosure of facts to put BCM on notice of circumstances which would have prevented its misunderstanding from continuing. In *Hamilton Enterprises,* GSBCA, 82–1 B.C.A. (CCH) ¶ 15,626, the Board held that verification was inadequate where it indicated only the disparity in bids and did not state either the agency's estimate of the man-hours required, even though the Government was in a better position than the bidder to estimate them, or the agency's own estimate of·

the contract price. A notation on the verification form to the effect that "the contract includes replacement of existing feeders on Feeder Schedule" would have sufficed in this case. As the Board stated, GSBCA, 80–2 B.C.A. (CCH) ¶ 14,798, at 73,-033, that fact was within the contracting officer's knowledge when he verified BCM's bid, but was not communicated to BCM. In these circumstances the verification thus was less than a full disclosure.

The Board condemned BCM for not submitting worksheets as Tunnel had, GSBCA, 80–2 B.C.A. (CCH) ¶ 14,798, at 73,033, but worksheets are only required if the bidder changed its bid because of errors in order to enable the Government to ascertain if the changes were justified.[9] The worksheet-checking process also precludes a bidder from taking advantage if the contracting officer discloses the Government's estimate, the only possible reason for withholding that information. Because Tunnel's bid was still $8,000 lower than BCM's after Tunnel's $10,000 error, the Board implied that BCM could have performed the contract, including the subject feeders, at its

---

**8.** Two cases that defendant argues support the contracting officer's actions, *Andy Electric Co.,* 81–2 Comp.Gen. Procurement Decisions ¶ 111 (Fed.Publ.1980), and *Bergen Metal Products,* Unpub.Comp.Gen. B–199,290, July 22, 1980, do not excuse his failure to include the subject feeders interpretation problem in his verification notice. In *Andy* verification was deemed adequate when it included notice of bid discrepancy, as here. However, under the facts of *Andy,* the failure of the verification to include the corrected government estimate was excused because the contracting officer actually was not aware that an amendment to the solicitation would increase the Government's estimate. Without such knowledge, the Comptroller General concluded that bad faith could not be imputed to the contracting officer. The contracting officer in *Andy* communicated to the bidder all the information of which he actually was aware, whereas the contracting officer here withheld relevant knowledge. *Bostrom* is to the same effect, holding that "since Bostrom has been adequately advised *of all the known facts* which suggest the *possible* occurrence of a mistake ...." verification was adequate. Unpubl.Comp.Gen. B–199,290 at 3523 (emphasis added). All of the known facts were not communicated to BCM. Moreover, *Bostrom,* although holding that the contracting officer

was not on constructive notice of Bostrom's specific error, is distinguishable because there were no bids lower than Bostrom's and, therefore, no actual knowledge of other interpretations of the solicitation. In neither *Andy* nor *Bostrom* was the contracting officer aware of an error which reasonably could have been committed by other contractors.

**9.** Defendant argued that BCM weakened its position by merely checking for mathematical errors when it responded to the verification request and by failing to submit worksheets, as Tunnel did—which would have disclosed BCM's interpretation of the subject feeders. See *supra* note 3. As noted in the text, worksheets were to be submitted only if errors were discovered. Both BCM and Tunnel performed the same verification process, checking for computation errors, and, since BCM had committed none, no worksheets were submitted. It certainly would be unfair if during verification, which was accomplished jointly of BCM and Tunnel, BCM was prejudiced by failing to make an error that Tunnel made, which error allowed Tunnel's bid to be checked for its interpretation of the subject feeders, however incidentally, while BCM's bid was not accorded similar scrutiny.

bid price. GSBCA, 80–2 B.C.A. (CCH) ¶ 14,798, at 73,034. The error in relying on this factor is that whether defendant properly discharged its verification duty must be assessed at the time both Tunnel and BCM were notified, not in later determining whether Tunnel's response cancelled out the possibility that BCM had made the same error as LD/S.

The Board designated bid acceptance as the only time at which the contracting officer is held to have knowledge. GSBCA, 80–2 B.C.A. (CCH) ¶ 14,797, at 73,034. When BCM's bid was accepted, the contracting officer knew that Tunnel had included the subject feeders in its interpretation. The contracting officer was faced with a multiplicity of factors at bid acceptance—which the Board set forth at GSBCA, 80–2 B.C.A. (CCH) ¶ 14,798, at 73,034 (and these arguably vitiated one another, according to the Board). At the time verification was sought of Tunnel and BCM, however, the contracting officer was aware only 1) that LD/S, bidding $189,300, omitted the subject feeders; 2) that the cost of the subject feeders was not known; and 3) that Tunnel had bid $229,850 and BCM, $248,000 against the Government's estimate of $300,-000.

The cases defendant proffers do not dispute the discharge of a bid verification duty at a time prior to bid acceptance. *Aydin Corp. v. United States*, 229 Ct.Cl. ——, 669 F.2d 681 (bid out of line with other bids, but the contracting officer knew it to be in line with government estimate and had been made by a bidder with lower overhead than higher bidders); *Paragon Energy Corp. v. United States*, 230 Ct.Cl. —— (1982) (bid out of line with other bids, but in line with government estimate); *Chernick v. United States*, 178 Ct.Cl. 498, 372 F.2d 492 (mistake reformed for clerical error) (1967); *Wender Presses, Inc. v. United States*, 170 Ct.Cl. 483, 343 F.2d 961 (1965) (bid disparity alone explained by bid item being surplus property given to wide range of costs). None of these cases involved errors by previous bidders; indeed, each is limited to one of the circumstances enumerated by Doke, whereas two of these factors were present

here. Moreover, in each case, except *Chernick,* the contracting officer was not required to verify because he was not on constructive notice of a bid error. In *Chernick* where the bidder prevailed, no verification was attempted. These cases treat the facts that give rise to the verification duty, not how it is discharged.

Defendant also argues that no case has held that the contracting officer's duty to verify includes communicating information outside the four corners of the individual bid. This argument ignores cases on the communication of the government estimate, the disparity with other bids, or the past procurement history of the solicited item (if the solicitation is a supply contract)—all of which are factors beyond the bid sought to be verified.

Finally, defendant posits a parade of horribles should a contracting officer be charged with a duty to disclose mistakes of other bidders if, in doing so, he were required to speculate that a given bid may be due to a mistake that one bidder may have made, yet another bidder did not make. Still worse would be the duty at contract award to advise all bidders of all bid mistakes known or which should be known as of that date. Neither of these scenarios follows from the holding in this case, which addresses the discharge of the duty to verify when speculation is absent as to the nature of the possible mistake that could be shared by all bidders undergoing verification. All three bids, LD/S, Tunnel, and BCM, were well below the government estimate and out of line with the other bids, which all parties concede indicated a mistake. In verifying the two bids next in line, the contracting officer should have exercised good faith by communicating his knowledge of the disqualifying LD/S mistake.

The Board erred as a matter of law in concluding that the duty to verify had been discharged at the time of award, given that BCM's mistake was based on an unreasonable contractual interpretation. According-

ly, BCM is entitled to an equitable adjustment.

### CONCLUSION

The case was tried to the Board reserving quantum for later determination. Based on the foregoing, plaintiff's cross-motion for summary judgment is granted and defendant's cross-motion is denied. The case is remanded to the General Services Administration Board of Contract Appeals pursuant to RUSSC 60.1(a) for determination consistent with the foregoing on quantum. The court instructs the Board to award an amount no higher than the difference between BCM's bid and that of the next lowest bidder. FPR 41 C.F.R. § 1–2.406–4(b)(ii) (1982); *see Chernick v. United States,* 178 Ct.Cl. at 507, 372 F.2d at 497.[10] Proceedings are stayed for a period not exceeding six months. Plaintiff's counsel shall provide a report every 45 days pursuant to Rule 60.1(a)(5), and the parties are alerted to the requirements of Rule 60.1(b).

IT IS SO ORDERED.